MEANT TO BE—

*)ay*

# IMAGINE THE WORLD OF POSSIBILITIES

*that Awaits You*

Welcome to the Marriott Vacation Club International family of Owners. The following pages will
give you just a taste of the adventures that are in store for you. Buckle up! This is just the beginning
of a lifetime of awesome vacations.



### SIMPLICITY

We're talking about vacations, so why work? As a
valued Owner, we'll assist you whenever you need
help in planning your vacations, making reservations
and more. We'll help make every vacation perfect.

### VALUE

Over the course of a few decades, your family could
save thousands upon thousands of dollars compared
to ever-increasing hotel or resort rates. Vacation
Ownership is now widely regarded as the leading
way to hedge against "vacation inflation."



**EXHIBIT 1**



# Imagine

## THE FUN YOU'RE GOING TO HAVE

Not many things in life are certain, but the time you spend fostering relationships and memories is sacred. With Marriott Vacation Club International—Vacation Ownership from a name synonymous with hospitality excellence for more than 75 years—you have an amazing foundation for a lifetime of both.

Close your eyes, listen to your heartbeat and try not to let the butterflies overtake you as you begin to consider the experiences you'll share: Sinking your bare feet into pristine sand... Pausing to savor the resonant sound of a new titanium driver... Humbling yourself with breathtaking views from high atop the Eiffel Tower... Or proudly donning windburned cheeks, fresh off the slopes...

To whet your appetite, inside you'll find a glimpse of each of the resorts and destinations worldwide that you now have available to you.

# IMAGINE VACATION OWNERSHIP AS IT WAS MEANT TO BE—
## *The Marriott Way*

As part of the Marriott Vacation Club family of Owners, you'll enjoy the experience
of a lifetime, backed by our lifetime of experience. It doesn't take long to see
that Vacation Ownership with Marriott offers distinct advantages.

IMAC

*th*

Welcome to the Ma
give you just a tast
of a lifetime of awe



**COMFORT**

Relaxing in the comfort of your spacious home away from
home, it won't take long for you to notice that your beautifully
appointed villa or suite offers unexpected amenities at every
turn. Settle in and enjoy yourself—you're on vacation.

**FLEXIBILITY**

Experience any property within the Marriott Vacation
Club system. Exchange within a worldwide system
of resorts through Interval International . Or trade
for Marriott Rewards  points that can be used for
cruises, airline travel or a host of other options.

**SIMPLICITY**

We're talking about vacations, so w
valued Owner, we'll assist you whe
help in planning your vacations, ma
and more. We'll help make every va

IMAGINE A

# *Wealth of Privileges...*

### USE YOUR WEEK AT YOUR HOME RESORT

Carve out your favorite vacation in your favorite destination, time and again. By returning to your home resort, you can establish family traditions and really get to know your home away from home.

### EXCHANGE AND SEE THE WORLD

The advantages of your ownership with Marriott Vacation Club extend far beyond your own resort. You're also eligible to exchange your vacation to other resorts in fantastic destinations around the world within the Marriott Vacation Club network.

What's more, you also may exchange your vacation to more than 2,000 additional Interval International® resorts in 75 countries. Now you truly can imagine how no other Vacation Ownership program offers more possibilities.

### TRADE FOR THE FLEXIBILITY OF MARRIOTT REWARDS' POINTS

As part of the Marriott Vacation Club family of Owners, it's easy to earn and redeem Marriott Rewards points. We've carefully arranged the finest collection of reward options, and we're very proud to offer you a seemingly endless array of options to enjoy. Ownership gives you access to more than 2,000 Marriott hotels, resorts and suites worldwide. Your Marriott Rewards points may be redeemed for anything from airline travel to luxury cruises. For more information, see your *Guide to Marriott Rewards* or visit www.marriottrewards.com.

WITH SO MANY OPTIONS,

*the Value is Immeasurable*

If you want to witness the changing of the guards at Buckingham Palace for an unforgettably royal London experience, you can. Choose the international exhilaration of Hong Kong. Or maybe saunter over to San Francisco for historic cable cars and the landmark Golden Gate Bridge. It's all up to you, and the possibilities are endless.

28



6649 WESTWOOD BOULEVARD · SUITE 500 · ORLANDO. FL 32821 · WWW.VACATIONCLUB.COM

This is neither an offer to sell nor a solicitation to buy to residents in states in which registration requirements have not been fulfilled.

IS ADVERTISING MATERIAL IS BEING USED FOR THE PURPOSE OF SOLICITING SALES OF TIMESHARE PERIODS.

# EXHIBIT 2

ial assessment,
ent pursuant to

and regulations

een reserved at
pancy for such
d use, at no cost
penses for such
timely reserved
ners who fail to
he Reservation
owever, loss of
not excuse the
intenance Fees,

### IV. PUBLIC OFFERING STATEMENT TEXT

### HAO CONDOMINIUM

**1.    The Condominium and Timeshare Plan.**

**a.    Description of the Condominium and Timeshare Plan.** The name of the Condominium is HAO Condominium. The Condominium is located at 7000 Grand Horizons Boulevard, Orlando, Florida 32821 in Orange County, Florida, and the land and improvements are graphically described in the Condominium Drawings. The Condominium has been created and is being sold on a fee title basis. The Developer has submitted the underlying property in Phases 1, 2, 3 and 4 (Buildings 10, 12, 13, 14, 15, 28 and 29 and related common areas) to the condominium form of ownership. Under the Timeshare Plan, fee title to a Timeshare Estate will be conveyed to a Purchaser for a stated period of years, unless extended in accordance with the terms of the Declaration of Condominium, together with a remainder over in fee simple as tenant in common with all other Owners of Timeshare Estates in the same Timeshare Unit. Title to Timeshare Estates will be transferred to Purchasers by special warranty deed. There will be no leases underlying any of the Condominium Property.

The Developer may also offer Biennial Timeshare Estates for sale with usage on a Biennial Unit Week basis. At the time of recording of a deed to a Biennial Timeshare Estate in a given Timeshare Unit, the Developer shall indicate whether the Biennial Unit Week usage is either an Even Year Biennial Unit Week (by placing an "E" after the Unit Week designation) or an Odd Year Biennial Unit Week (by placing an "X" after the Unit Week designation).

**b.    Condominium Common Expenses, Common Surplus and Common Elements; Allocations Under the Timeshare Plan.** With the exception of the Commercial Units, each Unit's share of the Condominium Common Expenses and Common Surplus and each Unit's undivided interest in the Common Elements of the Condominium shall be equal and shall be as set forth in Exhibit "D" to the Declaration of Condominium. A total of 99.99% of the Condominium Common Expenses, Common Surplus and Common Elements, shall be allocated to the Units in the Condominium other than Commercial Units. A total of 0.01% of the Condominium Common Expenses, Common Surplus and Common Elements shall be allocated to the Commercial Units. Subject to adjustment to account for Timeshare Estates owned by the Association or for different Timeshare Unit types that could be created in subsequent phases, each Owner of a Timeshare Estate shall be responsible for an equal Maintenance Fee and have equal ownership in the Common Surplus and the Common Elements attributable to the Timeshare Unit in which it is located. Each Owner of a Biennial Timeshare Estate with usage on a Biennial Unit Week basis is responsible for one-half of said Maintenance Fee amount and has one-half of the ownership interest described above. Unless the Board of Directors determines otherwise, Owners of Biennial Timeshare Estates shall pay their share of the Maintenance Fees and Ad Valorem Taxes each year regardless of whether or not their Biennial Unit Week usage occurred in such year. Maintenance Fees associated with Timeshare Estates owned by the Association shall be borne on an equal basis by all Owners of Timeshare Estates other than the Association.

1

Voting rights in the Association are not appurtenant to any Commercial Unit nor any Timeshare Estate owned by the Association wherein the associated Unit Week has been designated by the Developer for usage for maintenance purposes only pursuant to Section 7.4 of Article VII of the Declaration of Condominium.

**2.     Club or Recreational Facilities; Memberships; Recreational Leases.**    There are no club memberships, recreational leases or recreational facilities memberships associated with the Timeshare Plan.

**3.     Term of the Timeshare Plan.** The duration of the Timeshare Plan may continue indefinitely if the Owners of Timeshare Estates shall so elect. *Unless the term is extended for successive ten (10) year periods based on a majority vote of the Owners voting, then pursuant to the provisions of Section 17.2 of Article XVII of the Declaration of Condominium, Owners of Timeshare Estates shall become the Owners of undivided interests in their Timeshare Unit as tenants in common with the other Owners of Timeshare Estates in that particular Timeshare Unit on Day #1 of Unit Week #1 in the year 2060.*

**4.     Site Entities and Operations; Judgments and Pending Lawsuits.**

    **a.     Site Entities and Operations.**

        **(1) Responsible Entities.**

            **(a) The Developer.**    The developer of the Condominium and Timeshare Plan is Marriott Ownership Resorts, Inc., a Delaware corporation, d/b/a Horizons by Marriott Vacation Club (the "Developer"), whose principal address is 6649 Westwood Boulevard, Suite 110, Orlando, Florida 32821-6090. The Developer is wholly owned by Marriott International, Inc., and it has been involved in the timeshare industry since April 1984. The President and principal directing the creation of the Condominium and the sale of Timeshare Estates for the Developer is Stephen P. Weisz. The Developer itself, or through wholly-owned subsidiary or affiliated companies, has been extensively involved in the development, management and marketing of quality timeshare projects on Hilton Head Island, South Carolina, in Orlando, Palm Beach Shores and Fort Lauderdale, Florida, in Vail, Colorado, in Palm Desert, California, in Williamsburg, Virginia, on Kauai, Hawaii, in Mallorca and Marbella, Spain, in Aruba and elsewhere.

            **(b) The Managing Entity.** The Association and the Management Company are the Managing Entity.    Pursuant to applicable Florida law, these entities are responsible for the faithful discharge of the duties of the Managing Entity, including, but not limited to, the maintenance and operation of the Timeshare Plan.

The Developer does not have the right to terminate the Association or the Management Agreement between the Management Company and the Association or otherwise change the Managing Entity.    However, the Developer does have the right to control the Association through the appointment of a majority of the Board of Directors after a majority of the Unit

2

nmercial Unit nor
it Week has been
t to Section 7.4 of

l Leases. There
erships associated

'lan may continue
m is extended for
f, then pursuant to
inium, Owners of
'imeshare Unit as
ar Timeshare Unit

its.

ondominium and
l/b/a Horizons by
6649 Westwood
/holly owned by
since April 1984.
sale of Timeshare
gh wholly-owned
he development,
l, South Carolina,
i, in Palm Desert,
arbella, Spain, in

the Management
hese entities are
icluding, but not

the Management
wise change the
the Association
rity of the Units

have been sold, pursuant to applicable Florida law. (See Section 5.j. below and Section 19(b) of Article IV of the Bylaws, which is attached to this Public Offering Statement as Exhibit 3, for further details.)

Through the Management Agreement, the Association has delegated its management, maintenance and operations duties to the Management Company.

The Management Agreement has an initial term of three (3) years. The Management Agreement shall be automatically renewed for successive three (3) year periods unless terminated earlier in accordance with Florida law. The Management Company may only be terminated by a vote of the Owners as provided for in Chapter 721 or Chapter 718. In no event may the Association or the Board of Directors terminate the Management Company without such a vote.

The services to be provided by the Management Company include, but are not limited to, the following: hiring, paying and supervising maintenance personnel; arranging for the maintenance and repair of the property of the Condominium and Timeshare Plan; promoting compliance by the Association and all of its members and guests with all laws, statutes, ordinances and rules of all appropriate governmental authorities; purchasing equipment and supplies necessary to properly maintain and operate the Condominium and Timeshare Plan; maintaining all insurance required by the Condominium Documents; maintaining the Association's financial record books, accounts and other records in accordance with the Bylaws and Florida law; collecting all maintenance assessments and maintaining such funds in approved bank accounts; operating any telephone switching equipment to service Units and the Condominium and Timeshare Plan; operating the process for reserving usage of Timeshare Units pursuant to the Reservation Procedures; providing all required annual financial reports to Owners; arranging for an annual independent audit; enforcing by legal means the provisions of the Condominium Documents and employing such other professionals as may be reasonably required to carry out its duties under the Management Agreement.

For the 2006 operating year, the estimated annual Management Fee for Phases 1, 2, 3 and 4 of the Condominium and Timeshare Plan, will be $642,895 which equals $53,575 per month. A copy of the 2006 Estimated Operating Budget, which includes the annual management fee, is attached to this Public Offering Statement as Exhibit 4.

**(2) Contracts or Leases that may be Canceled by Owners.** There are no service, maintenance, or recreation contracts or leases that may be cancelled by Owners except for the Management Agreement, which has been described in Section 4.a. (1)(b) of this Public Offering Statement.

**b.     Judgments and Pending Lawsuits.** There are no judgments against the Developer, the Association or the Management Company which affect title to the underlying land and improvements of the Condominium or which materially affect the rights or obligations of Owners, nor is there any litigation pending which might result in such a judgment.

**5.    Description of the Site.**

a.    **Accommodations and Facilities; Restrictions on Use of Units; Remedies for Delinquent Payment of Assessments or Maintenance Fees.**   As more specifically described in Section 5.b. below, the Condominium and Timeshare Plan will be developed in phases pursuant to Chapters 718 and 721.  At this time, the Developer has built Phases 1, 2, and 3 and has proposed plans for Phase 4.  Phase 1 consists of one building consisting of 30 Units designated as Building 10, and a second building commonly referred to as the Central Facilities Building, which contains common areas and 5 Commercial Units designated as CU-1 through CU-5. The Developer has subjected both buildings in Phase 1 to the Timeshare Plan.  Phase 2 consists of one building consisting of 72 Units joined together in what is designated as Buildings 12 and 13, which the Developer likewise has subjected to the Timeshare Plan.  Phase 3 consists of two buildings consisting of 66 units joined together in what is designated as Buildings 14 and 15, which the Developer has subjected to the Timeshare Plan. Phase 4 will consist of two buildings consisting of 72 Units joined together in what is designated as Buildings 28 and 29, which the Developer has subjected to the Timeshare Plan. The aforedescribed improvements in Phases 1, 2, 3 and 4 are reflected on the Condominium Drawings.

Each Unit (excluding Commercial Units) contains two bedrooms and two bathrooms and an area of approximately 1,082 square feet. It is anticipated that 24 of the Units in Phase 4 will be Lock-Off Units that contain a "lock-off" feature and can thus be reserved for either separate or simultaneous use pursuant to the Reservations Procedures.  Through the use of such lock-off feature, these Units may be simultaneously occupied as a separate one-bedroom suite and a separate guest suite or studio. It is anticipated that a limited number of the Units in future phases will also contain this usage feature.  The Developer has furnished each Unit and spent a minimum of $13,600 per Unit on the personal property to do so.

The Developer is under no obligation to construct or declare as part of the Condominium and/or Timeshare Plan any phase other than Phases 1, 2, 3 and 4 of the Condominium.   Additionally, in the event Developer elects to construct and declare any subsequent phase or phases, the Developer reserves all rights as set forth in Section 5.b. below to revise the proposed plans for such phase or phases.  There are currently 240 Units declared to the Condominium Regime and 12,480 Timeshare Interests declared or subject to being declared to date.

(1)    **Restrictions on Use of Units.** Article XII of the Declaration of Condominium sets forth various restrictions on the use of the Accommodations and Facilities. As provided for in the Declaration of Condominium and subject to the Bylaws, the Management Company, unless the Board of Directors reserves said right to itself, has the right to promulgate rules and regulations in order to control the operation and the use of the property of the Condominium and Timeshare Plan. Pets are not permitted within the Condominium. There are no restrictions upon children occupying Units.

(a)    **Floating Time.** Under the Timeshare Plan, each Purchaser will be deeded a Timeshare Estate that corresponds with a specific Unit and Unit Week.  Those corresponding with Unit Weeks #1 through #51 will be subject to Floating Time

4

Use of Units;
'ees.   As more
tare Plan will be
:veloper has built
: of one building
only referred to as
ommercial Units
; in Phase 1 to the
l together in what
subjected to the
l together in what
: Timeshare Plan.
vhat is designated
:share Plan. The
ie Condominium

lrooms and two
at 24 of the Units
is be reserved for
hrough the use of
'ate one-bedroom
er of the Units in
ed each Unit and

e as part of the
3 and 4 of the
and declare any
tion 5.b. below to
its declared to the
being declared to

e Declaration of
and Facilities. As
the Management
ght to promulgate
property of the
inium. There are

hare Plan, each
ic Unit and Unit
to Floating Time

and the restrictions set forth at Article XII of the Declaration of Condominium. With Floating Time usage, an Owner may reserve the use of a Timeshare Unit beginning twelve (12) months in advance of the requested Check-in Day during a Unit Week with the same Season as that coinciding with the Unit Week associated with the Timeshare Estate which has been conveyed to his Purchaser. Owners who own multiple Timeshare Estates may request Concurrent Usage or Consecutive Usage thirteen (13) months in advance of the requested Check-in Day; however not more that fifty (50%) percent of available usage may be reserved more than twelve (12) months in advance. Use of a Designated Unit will be assigned by the Management Company upon the Check-in Day, or earlier, if possible and permitted under the Reservation Procedures. Failure to use the Accommodations and Facilities in any given year does not excuse the Owner from the obligation of paying required Maintenance Fees, Ad Valorem Taxes, and/or other charges. Beginning seventy five (75) days prior to the first day of available occupancy, the Developer shall be entitled to reserve and use, without any obligation to pay any Timeshare Plan Common Expenses for such usage, any and all Timeshare Units for which usage has not been assigned. In the event the Developer exercises this right, Timeshare Units so reserved may not be available for reservation and use by all Owners and may result in unavailability for use in that year by Owners who previously did not have a confirmed reservation (See Article XII of the Declaration of Condominium and the Reservation Procedures). Furthermore, use of the Units by Developer in any given year does not excuse the Timeshare Estate Owner from the obligation of paying required Maintenance Fees, Ad Valorem Taxes, and/or other charges for that year.

**The right to reserve a timeshare period is subject to the rules and regulations of the timeshare plan reservation system.**

(b) **Fixed Time.** Under the Timeshare Plan, the Timeshare Estate corresponding with Unit Week #52 will be subject to use on a Fixed Time basis and the restrictions set forth under Article XII of the Declaration of Condominium. An Owner whose Timeshare Estate corresponds with Unit Week #52 has the right to occupy a Timeshare Unit during Unit Week #52 every year (or every-other-year in the case of a Biennial Timeshare Estate) with the Day #1 or Check-in Day assigned pursuant to the Reservation Procedures and the Designated Unit to be used assigned by the Management Company upon check-in. Notwithstanding the foregoing, Owners with usage on a Fixed Time basis, may annually elect to have usage on a Floating Time basis within the Platinum Season by notifying the Management Company at the time they make a reservation request of their desire to make such election. If the requested Floating Time usage is available, then such Owners shall be treated as having usage on a Floating Time basis for that given year and be able to request usage as Owners with regular usage on a Floating Time basis. Reservation requests may be made beginning twelve (12) months in advance of the requested Check-in Day. Concurrent Usage and Consecutive Usage can be requested thirteen (13) months in advance as described above for Floating Time Usage. Failure to use the Accommodations and Facilities in any given Use Year does not excuse the Timeshare Estate Owner from the obligation of paying required Maintenance Fees and Ad Valorem Taxes. Beginning seventy five (75) days prior to the first day of available occupancy, the Management Company may randomly assign usage for a specific Check-in Day for Owners who do not yet have a confirmed reservation. (See Article XII of the Declaration of Condominium and the Reservation Procedures.)

5

(c). **Lock-Off Use Rights.** Beginning with completion of construction and availability of occupancy of Units in Phase 4 in lieu of occupying the entire Timeshare Unit during a Unit Week, each Owner may make a request (i) to occupy a part of one of a certain limited number of available Timeshare Units, with the remaining part of such Unit being "locked-off" and being subject to exclusive use by others (defined above as a "Lock-Off Unit"); and (ii) to occupy the other part of a Lock-Off Unit during a different period of time, with the remaining part of the Lock-Off Unit being "locked-off" and being subject to simultaneous and separate use by others.

The Management Company, from time to time, in it sole discretion, may cease usage of Lock-off Units by certain Owners based on numerous factors, including, but not limited to the volume of Owner usage of Lock-Off Units and availability of the Lock-Off Units. As such, there is no guarantee that an Owner will be able to confirm a reservation for use of a Lock-Off Unit. In such event Owners who purchased a Timeshare Estate after June 21, 2003 shall be offered a preference in the use of Lock-Off Units as determined by the Management Company. (See Section 5 of the Reservation Procedures, attached hereto as Exhibit "E" to the Declaration of Condominium for further details.)

(d) **Split Week Use Rights.** The Developer reserves the right to offer and the Management Company has likewise reserved the right under the Reservation Procedures to institute a program to introduce more flexibility for Owners by permitting Owners to Split Week use occupancy during each use year in which they have the right to reserve and use a Timeshare Unit. (See Section 6 of the Reservation Procedures for more information)

**(2) Remedies for Delinquent Payment of Assessments or Maintenance Fees.** Each Owner is personally liable for all Assessments or Maintenance Fees assessed against the Owner's Unit or Timeshare Estate pursuant to the Declaration of Condominium and Chapter 718 or Chapter 721. The Association may file a lien and foreclose upon said lien and/or bring an action for a money judgment against a Delinquent Owner to collect all sums due the Association, including interest, late charges, costs and reasonable attorneys' fees.

The Association may also deny the use of the Accommodations and Facilities to any Delinquent Owner, or any person claiming use under such Delinquent Owner, who is delinquent in the payment of any Maintenance Fees assessed by the Board of Directors, or in the payment of applicable Ad Valorem Taxes. In order to exercise this right, the Association must provide notice of the entire amount of any delinquent amount due thirty (30) days prior to the first day of such Delinquent Owner's occupancy in accordance with Chapter 721. The notice shall be mailed to such Delinquent Owner at his or her last known address as recorded in the books and records of the Timeshare Plan. Proper notice is effective to bar such Delinquent Owner, including such Delinquent Owner's guests, lessees and third parties, from receiving use rights through an affiliated exchange program, until such time as such Owner is no longer delinquent. The Association may also bar the use of third parties receiving use rights through the affiliated exchange program by providing written notice of the denial of use to the affiliated exchange program.

6

with completion of
ccupying the entire
ccupy a part of one
g part of such Unit
ove as a "Lock-Off
ent period of time,
being subject to

ole discretion, may
, including, but not
he Lock-Off Units.
vation for use of a
after June 21, 2003
y the Management
Exhibit "E" to the

:loper reserves the
e right under the
ty for Owners by
hich they have the
rocedures for more

:s or Maintenance
es assessed against
Condominium and
on said lien and/or
:t all sums due the
:s.

is and Facilities to
nt Owner, who is
Directors, or in the
: Association must
) days prior to the
r 721. The notice
as recorded in the
r such Delinquent
from receiving use
wner is no longer
: rights through an
:e to the affiliated

The Association is also permitted to rent a Timeshare Unit otherwise entitled to be used by a Delinquent Owner pursuant to Chapter 721, provided the Association provides further notice that it intends to rent the Timeshare Unit otherwise entitled to be used by such Delinquent Owner. This notice must also be given at least thirty (30) days prior to the first day that such Delinquent Owner would otherwise be entitled to use a Timeshare Unit. The Association is not required to solicit rentals of Timeshare Units for every or any Delinquent Owner. The Association must apply the proceeds of such rental, net of any rental commissions, cleaning charges, travel agent commissions, or any other commercially reasonable charges reasonably and usually incurred by the Association to such Delinquent Owner's account. The Association is not required to rent any applicable Timeshare Unit for the highest nightly rental rate available, nor any particular rental rate. However, the Association must use reasonable efforts to secure a rental that is commensurate with other rentals of similar Timeshare Units during the same or similar use periods.

        **b.**     **Completion of Construction; Phasing.** Construction of Phases 1, 2 and 3 has been completed. Construction of Phase 4 is anticipated to begin December 2004 and is estimated to be completed by February 2006. Phases other than Phases 1, 2, 3 and 4 of the Condominium and/or Timeshare Plan may consist of additional Units, parking, common areas, recreational facilities, or some combination thereof. If future phases were built and declared, it is currently contemplated that the Condominium would contain no more than a total of 900 Units (excluding Commercial Units) nor more than 46,800 Unit Weeks (including Unit Weeks which may be restricted in use for maintenance purposes and not counting Unit Weeks twice when usage is on a Biennial Unit Week basis) available for use by Purchasers, although the Developer may elect to develop more Units and create more Timeshare Estates with corresponding Unit Weeks in the future as permitted by applicable law and the Declaration of Condominium.

Pursuant to Section 721.07(5)(t), Florida Statutes, there shall be no time limit during which the Developer must complete its phasing plan, and the Developer reserves the right to submit subsequent phases, if any, to condominium and/or timeshare ownership and/or use in any sequence. There is no assurance that any phase of the Condominium and/or Timeshare Plan other than Phases 1, 2, 3 and 4 will be constructed and declared to the Declaration of Condominium. Any subsequent amendment pursuant to which a particular phase is subjected to the Condominium and/or Timeshare Plan must be recorded prior to the closing of the purchase of any Unit or Timeshare Estate in that phase. Moreover, in accordance with Section 721.07(5)(t), Florida Statutes, and notwithstanding anything contained herein to the contrary, the Developer reserves all rights to vary the phasing plan of the Condominium and/or Timeshare Plan with respect to phase boundaries, Unit types, numbers of Units, floor plans, and recreational areas and facilities with respect to each subsequent phase. In accordance with Article XVIII of the Declaration of Condominium, the Developer may add subsequent phases to the Condominium and/or Timeshare Plan without the consent of Purchasers or Owners. The impact which the addition of subsequent phases would have upon prior phases would be to increase the number of Units (and possible common recreational facilities) and Owners, which would result in a reapportionment of the Condominium and Timeshare Plan Common Expenses, Common Surplus and ownership of the Common Elements in accordance with the formula described in Section

1.b. above. (See Article XVIII of the Declaration of Condominium for current information regarding phasing.)

c. **Facilities.**

(1) **Maximum Number of Owners of Units and Timeshare Estates that will use the Accommodations and Facilities.** If all potential improvements currently contemplated by the Developer are constructed, a maximum of Owners of 900 Units and 46,800 Timeshare Estates with usage on a Unit Week basis will use the Accommodations and Facilities. However, additional Owners of Timeshare Estates may use them in the event the Developer acquires more property or adds additional phases not currently contemplated, as provided in Article XVIII of the Declaration of Condominium and permitted by §721.07(5)(t), Florida Statutes.

(2) **Description of Facilities for Use Only by Purchasers of the Plan.**
In addition to Owners, all recreational or other commonly used facilities either already or to become part of the Condominium and/or the Timeshare Plan or otherwise available for use by Owners as shown on the Condominium Drawings whose use is not restricted will be available for use by short-term renters, exchangers or other users of the Accommodations and Facilities. Moreover, pursuant to Section 14.2 of Article XIV of the Declaration of Condominium, the Developer reserves the right to amend the Declaration of Condominium to provide for the sharing of the recreational facilities and other common areas of the Condominium with the Owners of Units in other resorts or condominiums located adjacent to or in near proximity to the Condominium.

Currently, the facilities located within existing phases graphically described on the Condominium Drawings are for use by the aforedescribed persons and include a heated swimming pool with an adjacent heated children's pool and whirlpool.

Within the Central Facilities Building, there are also lockers and pool bathrooms on the first floor, an exercise room on the second floor, and an area designed as a "Multi-Purpose Room" on the first floor to be used for meetings, Owner functions and various other similar purposes declared as part of the Condominium in Phase 1 that will be used by the aforedescribed persons.

(3) **Additions to Facilities**

## Facilities may be expanded or added without consent of the Purchasers or the Association.

The Developer expressly reserves the right to add additional areas and/or facilities in phases without the consent of Owners. More specifically, the Developer reserves the right, but not the obligation, to add such areas and/or facilities as it determines in its sole discretion constructing such areas and/or facilities in some or all phases. Any additional areas and facilities shall be constructed at Developer's sole expense, and upon declaration of phase

8

:urrent information

share Estates that
urrently
) Units and 46,800
ions and Facilities.
the Developer
is provided in
:)(t), Florida

ers of the Plan.
es either already or
ivailable for use by
d will be available
ions and Facilities.
Condominium, the
to provide for the
ominium with the
ar proximity to the

described on the
include a heated

bathrooms on the
a "Multi-Purpose
ious other similar
the aforedescribed

ut consent of

/or facilities in all
rves the right, but
sole discretion by
onal areas and/or
laration of phase

containing the additional area and/or facility as part of the Condominium, the same shall become Common Elements, or Commercial units with the rights of Owners, if any, to use the same described in the amendment adding such Commercial Units to the Condominium.

> **d.     Financial Arrangements for Promised Improvements.** There are future improvements contemplated but none promised yet. Any subsequent promised improvements will likely be financed through the Developer's own resources or through the use of inter-company loans provided to the Developer from its parent company, Marriott International, Inc., as was done for Phases 1, 2 and 3 and will be done for Phase 4.

> **e.     Insurance.** The Association has obtained and will continue to maintain property and public liability insurance as to all Timeshare Units, Limited Common Elements and Common Elements and the personal property contained therein (except for Limited Common Elements appurtenant to Commercial Units, if any, which shall be the responsibility of the Owner of any applicable Commercial Unit) accommodations, facilities and furnishings located within the Condominium Property in amounts by Florida law, the Declaration of Condominium and the Bylaws. The cost of any insurance obtained and maintained by the Association is a Condominium or Timeshare Plan Common Expense, as applicable, and will be included in the Maintenance Fee Schedule. No insurance other than that obtained and maintained by the Association has been obtained for Owners of Units or Timeshare Estates.

> **f.     Disclosures Regarding Real Property**

> > **(1) Unusual and Material Features of the Condominium Property.** There are no unusual and material features of the Condominium Property.

> > **(2) Land Not Owned or Leased by the Owners or the Association.** There will be no land and improvements thereon available for use by Owners which is not part of the Condominium or owned or leased by the Association, except for Commercial Units to which Owners may be granted an easement pursuant to Section 4.3 of Article IV of the Declaration of Condominium or for such other facilities owned by the Developer that may be available for use by Owners as by the general public.

> **g.     Description of Developer Financing Available to Purchasers.** Developer has made financing available for up to 90% of the purchase price of a Timeshare Estate with varying terms to qualified Purchasers. The interest rate will be fixed and is calculated on the basis of a 360-day year, collected for the actual number of days principal is outstanding in any calendar year, and is based on the assumption that all payments are made when due. Loan payments are to be made in installments calculated to repay the loan in full over the term of the loan. The principal balance may be pre-paid in whole or in part at any time without penalty. A service fee will be included in the monthly payment to cover administrative and processing costs. A late charge will be assessed for any installment not received within ten (10) days after the installment due date. The financing offered may be changed or withdrawn by the Developer, in its discretion.

9

h.   **Control of the Association**

## The Developer has the right to retain control of the Association after a majority of the Units have been sold.

The Developer will control the Association through the appointment of a majority of the Board of Directors until such time as transfer of control of the Association is required by Florida law. See Section 9.6 of Article IX of the Declaration of Condominium.

6.   **Budget, Dues and Fees.**

a.   **Timeshare Plan Estimated Operating Budget and Schedule of Purchasers' Expenses.** The current Estimated Operating Budget (or Maintenance Fee Schedule as it is commonly referred to) for the Timeshare Plan and a schedule of the purchaser's projected expenses are attached to this Public Offering Statement as Exhibit 4.

b.   **Developer Guarantee.** Pursuant to Chapter 721, the Developer guarantees to each Owner of a Timeshare Estate through December 29, 2006, that the total annual Assessment for the Timeshare Plan Common Expenses (commonly referred to as the "annual Maintenance Fee") imposed upon Owners of Timeshare Estates will not exceed $567.46 per Timeshare Estate (one-half this amount for Biennial Timeshare Estates) exclusive of Ad Valorem Taxes which may be billed separately or as part of the same statement as the annual Maintenance Fee but are distinct charges not included in the Developer's guarantee. In consideration of this guarantee, the Developer shall be excused from the payment of its share of the Timeshare Plan Common Expenses which otherwise would have been assessed against its unsold Timeshare Estates during the term of the guarantee. As a consequence of this exemption, the Developer shall pay any amount of the Timeshare Plan Common Expenses incurred each year which exceed the total revenues for the Timeshare Plan for such year for so long as the guarantee remains in effect. The Developer reserves the right, but not the obligation, to extend and increase the amount of this guarantee for one or more periods of one year each after the expiration of the guarantee period on December 29, 2006, as permitted by Florida law pursuant to Section 721.15(2), Florida Statutes.

7.   **Purchase of a Timeshare Estate.**

a.   **Purchasers' Right of Cancellation.** The Purchasers' right of cancellation is *as is set forth under the Contract for Purchase which is as follows:*

**You may cancel this contract without any penalty or obligation within 10 calendar days after the date you sign this contract or the date on which you receive the last of documents required to be given to you pursuant to section 721.07(6), Florida Statutes whichever is later.**

**If you decide to cancel this contract, you must notify the seller in writing of your intent to cancel.** Your notice of cancellation shall be effective upon the date sent and shall be sent to Marriott Ownership Resorts, Inc., Attn: Manager, Sales Administration, 7000 Grand

control of th
d.

ajority of the Boa
tired by Florida law

et and Schedule
nance Fee Schedule
urchaser's projected

721, the Developer
2006, that the total
y referred to as the
not exceed $567.46
s) exclusive of Ad
ment as the annual
r's guarantee. In
ment of its share of
assessed against its
e of this exemption,
nses incurred each
for so long as the
bligation, to extend
year each after the
lorida law pursuant

ight of cancellation

10 calendar days
ve the last of all
Florida Statutes,

of your intent to
ad shall be sent to
ion, 7000 Grand

lvard Orlando, Florida 32821. Any attempt to obtain a waiver of your rights is void and of no effect. While you may execute all closing documents in the closing, as evidenced by delivery of the deed or other documents, before of your 10-day cancellation period is prohibited.

Chapter 721 provides that you have the right to cancel your purchase agreement until of the 10th calendar day following whichever of the following days occurs later: (a) the date; or (b) the day on which you received the last of all documents required to be to you.

**b.** **Total Financial Obligation of Owners; Schedule of Estimated Closing Entities that may Alter, Amend or Add to Charges for which Owners are Responsible.** The following is a listing of Owners' total financial obligation in connection with the purchase of a Timeshare Estate:

(1) Purchase price;

(2) Finance charges (if applicable);

(3) Maintenance Fees;

(4) Ad Valorem Taxes;

(5) Exchange company fees (see Section 8 below);

(6) Closing Costs/Administrative Fees (as set forth below and in the Contract for Purchase); and

(7) Special Assessments (if any)

(8) International Owner's Surcharge (if applicable)

As set forth in the Contract for Purchase, the Purchaser shall be required to pay all closing costs associated with the purchase, financing and conveyance of a Timeshare Estate, which shall not exceed the amount specified in the Contract for Purchase, or the actual closing costs, whichever is less, including, but not limited to the following: cost of recording the deed, documentary stamp tax on the deed, fees associated with the Owner's and mortgagee's (if applicable) title insurance policies (which include the title insurance premium and administrative and processing fee), cost of recording the purchase money mortgage (if any), and applicable intangible and documentary stamp taxes on the purchase money mortgage (if any). The Purchaser will also be responsible for paying at closing or a subsequent date as determined by the Management Company the first year's Maintenance Fee and Ad Valorem Taxes for each Timeshare Estate purchased.

11

The following entities may have the right to alter, amend or add to the charges for which Owners are responsible: Board of Directors, the Orange County Tax Assessor, the Developer and any provider of exchange program benefits, if applicable.

c.  **Status of Title to Underlying Real Property.** The Developer previously held legal title to the underlying real property comprising Phases 1 and 2 of the Condominium, which property is now owned by Owners, including the Developer, as their interests appear of record. The Developer holds legal title to the underlying real property designated as Phase 3 and all Future Phases(s) of the Condominium on the Condominium Drawings. There are no liens, defects, judgments or mortgages affecting the Developer's title to any such property.

d.  **Restrictions Upon the Rental or Resale.**

**The sale, lease, or transfer of Timeshare Estates is restricted or controlled.**

Pursuant to Section 13.2 of Article XIII of the Declaration of Condominium, the Developer has a right of first refusal to purchase or lease for a period of three years or more any Unit or Timeshare Estate (or the applicable Timeshare Unit in the case of a lease) in accordance with the same terms and conditions which are otherwise accepted by the Owner from a third party. The right of an Owner to lease or rent his Unit or a Timeshare Unit for periods of less than three years is not subject to the approval of the Association; however, notice of such lease or rental of a Unit or Timeshare Unit must be delivered to the Association within five (5) days of the Owner's agreement to lease or rent.

**The purchase of a Timeshare Estate should be based upon its value as a vacation experience or for spending leisure time and not considered for purposes of acquiring an appreciating investment or with an expectation that the Timeshare Estate may be resold.**

Units and Timeshare Estates in the Condominium are offered for sale for personal use and enjoyment only and should not be purchased by any prospective Purchaser for resale or as an investment opportunity or with any expectation of achieving rental income, capital appreciation, or any other financial return or valuable benefit, including but not limited to a tax benefit. Owners attempting to resell or rent their Unit or Timeshare Estate would have to compete, at a substantial disadvantage, with the Developer in the sale or rental of its unsold Units or Timeshare Estates. Generally, there is no established market for the resale of Units and Timeshare Estates or for the rental of Units and Timeshare Units in the Condominium. In addition, the restrictions upon the use of Units and Timeshare Estates may adversely affect the marketability or rentability.

8.  **Exchange Program Opportunities.** The Timeshare Plan is participating in a priority or internal exchange program and an external exchange program. The name of

12

address
Internal
1920.
Develop
membe
is a pr
exchang
of time
Manage
Owners
Manage
offered
Interva
sole di
such cl
compar
and the
timesh
restrict

V:ORLS1

e charges f
Assessor, th

er previous
ondominiu
sts appear o
. Phase 3 an
are no lien

states i

eloper has a
any Unit or
nce with the
l party. The
s than three
or rental of
days of the

e based
ire time,
reciating
e may be

for personal
for resale or
me, capital
ited to any
uld have to
nsold Units
f Units and
ninium. In
affect their

ting in both
name and

... of the exchange company presently offering these exchange programs is Interval
International, Inc. ("Interval"), P.O. Box 431920, 6262 Sunset Drive, Miami, Florida 33243-
1920. The Developer has paid the Developer's application fee, and for each Purchaser, the
Developer will pay the Purchaser's initial membership fee at the time of closing. Thereafter,
membership in the external exchange program is at the option and expense of the Purchaser and
is a pre-requisite to participate in the internal or priority exchange program. The priority
exchange program is a special service being offered by Interval to the Developer and the Owners
of timeshare estates at those resorts developed and/or managed by the Developer or the
Management Company or any of their affiliated companies. Priority will be offered to such
Owners over other Interval members seeking an internal exchange into one of such Developer or
Management Company affiliated resorts. The external exchange program is a standard service
offered by Interval. Although the Developer has entered into a multi-year agreement with
Interval with respect to the offering of exchange services, the Developer reserves the right, in its
sole discretion, to change its affiliation to another exchange company at a future date, and any
such change will not be deemed a material change. Interval is an independent exchange service
company. The Owner's participation in the internal or external exchange program is voluntary,
and the use of either such exchange program is subject to availability and the number of other
timeshare estates in the exchange program, and the applicable rules, regulations, terms, and other
restrictions (including transaction fees) which may be set by Interval from time to time.

V:\ORLS35-Legal\Legal Shared\Horizons-Orlando\States\Florida\POS\HAO POS cln 12.27.05.doc

13

# EXHIBIT 3

## Congratulations, You Are on Your Way to a Lifetime of Vacation Memories with Marriott Vacation Club...

As you look forward to enjoying your Ownership, we've provided a few Frequently Asked Questions that may help you prepare and plan.

| | |
|---|---|
| **Q: *How do I start planning my first vacation?*** <br><br> A: Soon you'll receive a call from your personal Vacation Ownership Advisor. Your Advisor—a friend "in the know"—will guide you through your Usage Options, ensuring you understand how occupying, exchanging with Interval International© or trading for Marriott Rewards© points is accomplished, and will assist you in the process. <br><br> Within the next few weeks, you also will receive your Owner Reference Guide that contains all of this information and more. <br><br> **Q: *When will my contract be closed?*** <br><br> A: Closing is scheduled to take place on or before the date stated on your contract. <br><br> For cash contracts, closing will take place when all funds have been received and all documents have been received and processed. Please see the invoice within your contract for final amount due, when the final amount is due and where to submit. <br><br> For financed contracts, closing will take place automatically, providing all deposits and closing costs have been paid. Once your closing has occurred, you will receive a letter with all of your pertinent loan payment information and a payment coupon book prior to your first payment due date. | **Q: *What about my first maintenance fee bill? When do I receive that?*** <br><br> A: If you received current year usage for the week(s) purchased, you will receive your first maintenance fee invoice within 30 days of closing. This payment will be due in full within 30 days of the invoice date. <br><br> The annual maintenance fee billing occurs in the fall (October, November or December depending on the resort) with the payment due in January. <br><br> For purchases of Every-Other-Year Interests, maintenance fees will be billed in the same manner. However, you will receive a bill every year for one-half of the annual maintenance fee. <br><br> **Q: *When do I receive my purchase incentive?*** <br><br> A: All purchase incentives will be received within 90 days of closing. Your Vacation Ownership Advisor can book your purchase incentive and make all necessary reservations, whether at Marriott Vacation Club International resorts, Marriott hotels or exchanges with Interval International. <br><br> **Q: *When will I receive my recorded Deed and my Owner's Title Insurance Policy?*** <br><br> A: The recording of your Deed is handled by the County Recorder's Office (or the title company involved with your closing, if applicable). Please understand this may take up to 12 months, but not to worry, you still have full ownership access to your inventory. |

Should you need any additional assistance, please feel free to contact your Sales Executive.

# Horizons
### by Marriott Vacation Club
at Orlando

## Quality Assurance Checklist

Name (please print) _____     Unit(s) / Week(s) _____

Guest satisfaction results from your complete understanding of all components of the Marriott Vacation Ownership Program. Please take the time to review the following and sign in the space provided indicating that you understand each component. This effort will aid us in ensuring excellence beyond guest expectations.

- I/we understand that our purchase at Horizons by Marriott Vacation Club at Orlando is a fee simple ownership. Although a week and unit is assigned for deeding purposes, a reservation requesting a unit and a week within your season must be confirmed prior to actual usage.

- Reservation assignments for your season may be requested twelve months in advance of the requested check-in day (thirteen months for multiple-week owners who request concurrent or consecutive week assignments).

- Occupying another season is considered an Internal Exchange and is deposited and exchanged through Interval International's Horizons Desk Service.

- Horizons by Marriott Vacation Club at Orlando will enroll and pay the first year's dues to Interval International. All future dues and exchange fees will be the responsibility of the owner.

- *Current exchange fees per week for U.S. and Canada residents (exchange fees for residents of other countries may vary slightly):
  - Internal          $ 89.00
  - Domestic          $135.00
  - International      $149.00

- Occupancy of a Horizons villa for Interval International exchange purposes is 2 Bedroom - 6 people.

- *Marriott Rewards SM Certificates may have some restrictions and blackout periods. Your Horizons week may be traded for Marriott Rewards points on a non-consecutive use year basis. Please refer to the Marriott Rewards Membership Guide for important information.

- *Eligible owners at Horizons by Marriott Vacation Club are able to trade their home resort week(s) in qualifying years through Horizons FlexAwards program. Please refer to your *Guide to FlexAwards* for important program information.

- *Current processing fees for Horizons by Marriott Vacation Club at Orlando:
  - Marriott Rewards is $104.00 per deeded week, U.S. and Canadian residents; $124.00 for residents of all other countries. *If purchasing with current year usage (2006 as points in lieu of usage), purchaser will be responsible for the $104 domestic, or $124 International, processing fee.*
  - FlexAward exchange fee is $39.00, U.S. and Canadian residents; $59.00 for residents of all other countries.

- Processing fee for the Lockoff Usage Option will be $99.00. The Lockoff Usage Option will not be available until March 2006.

- Your first year Maintenance Fee will be billed annually in November prior to your first year occupancy. Maintenance Fees for 2006 are estimated at: 2 Bedroom = $567.46. Note: Purchasing with current year occupancy at the end of a calendar year will result in the billing of 2006 and 2007 maintenance fees and property taxes.

- Annual Real Estate property taxes are estimated at $84.18 for Gold weeks, $107.89 for Platinum weeks and $118.42 for Platinum Plus weeks and are billed with the Maintenance Fees.

- Marriott does not accept credit cards for Mortgage Loan Payoffs after closing.

- Closing can occur on, but not before the 12th calendar day from the contract date. Purchaser must notify the seller of their intent to switch to cash on, or prior to the 10th day. If not, the contract will close as a Finance transaction. There is no pre-payment penalty, however the purchaser will be responsible for any accrued interest and recording costs.
- Horizons by Marriott Vacation Club at Orlando currently does not offer a resale program.

- *Marriott Cheques are not acceptable forms of payment toward maintenance fee, property tax, mortgage, usage fees, escrow balance or closing costs. Marriott Cheques may not be returned for a full or partial refund.

_____  4-11-06     _____  4-11-06
Purchaser                 Date        Purchaser                 Date

_____               _____
Sales Executive                       Manager

*Fees and programs subject to change.                          HO 000614

2914    22    2Bedroom    Platinum

Post-ConstructionTAPP

**HAO CONDOMINIUM**
**CONTRACT FOR PURCHASE**

Developer/Owner/Seller: Marriott Ownership Resorts, Inc., P.O. Box 890, Lakeland, Florida 33802 Attn: Director of New Owner Administration

Purchaser(s): SALVATORE J. & JO C. DE SANTIS, 39 LAFAYETTE MILLS RD, MANALAPAN, NJ 07726, (H) 732-683-0230 *DNC* (B) 212-869-3200 *DNC*, WITH TITLE TAKEN AS SALVATORE J. DE SANTIS, Individual

I. **PROPERTY; OCCUPANCY; PURCHASE PRICE PER TIMESHARE ESTATE.** . Marriott Ownership Resorts, Inc., a Delaware Corporation, (hereinafter referred to as "Seller") agrees to sell and the aforedescribed Purchaser or Purchaser(s) (hereinafter referred to as "Purchaser") agrees to purchase, the following described timeshare estate(s) in HAO Condominium ("Condominium") located at 7000 Grand Horizons Boulevard, Orlando, Florida 32821 upon the following terms and conditions:

| Season | Unit No. | Week | Occupancy may commence in | Purchase Price $ |
|--------|----------|------|---------------------------|------------------|
| Platinum | 2914 | 22 | 2007 | 17,400.00 |

in the Condominium, according to the Declaration of Condominium thereof recorded or to be recorded in the Public Records of Orange County, Florida. Seller further agrees to cause Marriott Ownership Resorts Procurement, L.L.C., a Delaware limited liability company ("MORP"), to procure the furniture, appliances and equipment (the "Common Furnishings") for the Unit to which the subject Timeshare Estate(s) is appurtenant and to furnish such Unit with said Common Furnishings. The "Purchase Price" as listed under Item II. ("Purchase Price and Terms") below, includes a charge of (2.75%) of the Purchase Price representing the retail value of the subject Common Furnishings. Seller further agrees to cause MORP to procure the Common Furnishings for the Unit which is referenced in the Deed by which the Timeshare Estate(s) is being conveyed to you and to furnish such Unit with said Common Furnishings. If the Unit to which the Timeshare Estate(s) is an appurtenant Unit in which Seller will be conveying a timeshare estate to the Association such that an accompanying Use Period may be set aside by the Association for maintenance purposes, MORP hereby sells an undivided one fifty-first (1/51) interest in the subject Common Furnishings to Purchaser, and Purchaser hereby concurrently conveys such undivided interest to the Association. If the Unit is not such a Unit, MORP hereby sells an undivided one fifty-second (1/52) interest in the subject Common Furnishings to Purchaser, and Purchaser hereby concurrently conveys such undivided interest to the Association. The undivided interest in the subject Common Furnishings described in this paragraph shall hereinafter be referred to as "Common Furnishings Interest."

II. **PURCHASE PRICE AND TERMS.** The combined total Purchase Price ("Purchase Price") of the Timeshare Estate(s) (97.25%) and the Common Furnishings Interest(s) (2.75 %) payable in good U.S. funds is as follows:.............................. $    17,400.00
a.   Closing Costs ...................................................................................................... $       716.30
b.   Deposit (received on date of execution of this Contract) ........................................... $     1,740.00
c.   Additional deposit due by .......................................................... _.................... $        0.00
d.   Seller-financing (if applicable) .................................................................. $    16,376.30
e.   Balance of Purchase Price, including closing costs, payable at closing ........................ $        0.00

The balance of the Purchase Price shall be paid at closing (in cash, cashier's check, or certified check) or by the proceeds of a loan requested by Purchaser in the amount of the balance due. If Seller-financing is requested pursuant to Paragraph II(c) herein above, this Contract is contingent upon financing being made available by Seller, provided Purchaser makes a good faith effort to qualify for said financing to include, but not limited to, supplying all required documentation requested by Seller in order to evaluate Purchaser's credit-worthiness. For Seller-financed sales, there is a monthly service fee as provided for in the loan documents.

III. **EXPENSES AT CLOSING.** Purchaser agrees to pay all closing costs which shall not exceed $    716.30 or the actual closing costs, whichever is less. Seller will pay all standard closing costs in excess of the $   716.30 amount, except where a different closing agent and/or title agent other than those set forth at Paragraphs 5 and 10 below is selected by Purchaser, in which case Purchaser will pay all closing costs, whatever they may be. Closing costs associated with the purchase, financing and conveyance of a timeshare estate, include, but are not limited to: cost of recording the deed, documentary stamp tax on the deed, title insurance premiums, document preparation fees, cost of recording the purchase money mortgage (if any), any sales tax on the aforedescribed Common Furnishings Interest and applicable intangible and documentary stamp taxes on the purchase money mortgage (if any). In addition to closing costs, Purchaser shall pay at closing (or be billed within 30 days after closing) the first year's estimated maintenance fee of $ 567.46, (if the Purchaser has occupancy or beneficial use in the same year that closing occurs) and expenses for estimated ad valorem taxes of $ 107.89.

IV. **ASSESSMENTS AND OTHER EXPENSES.** From and after the closing, Purchaser will be responsible for payment of maintenance fees for each timeshare estate purchased as provided in the Declaration of Condominium. Purchaser shall be responsible for ad valorem taxes levied on the timeshare estate(s) and assessments or special charges levied by HAO CONDOMINIUM ASSOCIATION, INC. ("Association"). Should additional timeshare periods be created and timeshare estates be conveyed by Developer to the Association, Purchaser agrees to pay a proportionate amount of the Association's maintenance fees.

V. **CLOSING.** The estimated date of closing is within 15 days from acceptance of this Contract by Seller.

VI. **COMPLETION OF CONSTRUCTION.** The accommodations and facilities being offered are complete.

VII. **PURCHASER'S REPRESENTATIONS.** Purchaser warrants and represents to Seller that the purchase of the subject timeshare estate(s) is made for Purchaser's personal use. Seller makes no representations to Purchaser concerning rentals, rental income, income tax considerations or investment potential.

VIII. **DEFINITIONS; COMPLETE TERMS AND CONDITIONS.** The terms not otherwise defined herein shall have the meaning set forth in the Declaration of Condominium and/or Public Offering Statement. This Contract is also subject to the terms and conditions set forth in the following Paragraphs 1 through 23.

IX. **POWER OF ATTORNEY.** The undersigned Purchasers does hereby make, constitute and appoint Seller as Purchaser's true and lawful attorney, for Purchaser in Purchaser's name and on Purchaser's behalf for the limited purpose of performing all necessary matters concerning the correction of typographical, clerical and other non-material errors in documents prepared by Seller and associated with such closing, including, but not limited to, full power to sign, execute, acknowledge, deliver and set over all documents and instruments necessary for the correction of typographical, clerical and non-material errors, including, but not limited to, this Contract and any Note signed by Purchaser if such changes are non-material in nature and solely pertain to the correction of typographical, clerical and other non-material errors in such documents, for all intents and purposes as Purchaser might or could do if Purchaser was personally present; and Purchaser hereby ratify and confirm all that said attorney shall lawfully do or cause to be done

by virtue of these presents. This special power of attorney shall expire and be of no further effect upon the recordation of the special warranty deed conveying title to Purchaser.

X. ADDITIONAL TERMS. Seller to pay first year Interval International Membership fees. Purchaser(s) to pay ad valorem taxes. THE SUM OF $ 1,395.00 INCLUDED IN THE DEPOSIT IDENTIFIED ABOVE IS BEING CREDITED TO PURCHASER(S) PURSUANT TO THE PASSPORT TO PRIVILEGES MEMBERSHIP PLAN. NOTWITHSTANDING ANY CONTRARY PROVISION CONTAINED IN THIS CONTRACT, IN THE EVENT PURCHASER(S) CANCEL THIS CONTRACT OR THE TRANSACTION DOES NOT CLOSE, THE SUM OF $ 1,395.00 INCLUDED IN THE DEPOSIT ABOVE AND WHICH IS BEING CREDITED TO PURCHASER(S) PURSUANT TO THE PASSPORT TO PRIVILEGES MEMBERSHIP PLAN SHALL NOT BE REFUNDED. SELLER TO AWARD WITHIN 90 DAYS FOLLOWING CLOSING ( 1 ) INTERVAL INTERNATIONAL EXCHANGE WEEK, DEPOSITED TO PURCHASER II MEMBERSHIP ACCOUNT, WITH 12 MONTH EXPIRATION. ALL RULES GOVERNING USE OF EXCHANGE WEEKS WITH II APPLY. .

Purchaser acknowledges receipt of the following items: HORIZON'S OWNER MANUAL AND ALL ENCLOSED MATERIALS valued at $100 collectively. Purchaser further acknowledges that Seller considers these items a benefit received by Purchaser under the Contract for Purchase and that if Purchaser cancels the Contract for Purchase and does not proceed with the transaction, that Purchaser will return these items to Seller within 10 days of Purchaser's cancellation of the Contract for Purchase at Purchaser's expense. Purchaser further acknowledges that if Purchaser fails to do so, that Seller may reduce, or as applicable, direct Escrow Agent to reduce, the amount of escrowed funds returned to Purchaser by the amount of the contract benefits which Purchaser failed to return to Seller.

**Any resale of this timeshare interest must be accompanied by certain disclosures in accordance with Section 721.065, Florida Statutes.**

**YOU MAY CANCEL THIS CONTRACT WITHOUT ANY PENALTY OR OBLIGATION WITHIN 10 CALENDAR DAYS FROM THE DATE YOU SIGN THIS CONTRACT OR THE DATE ON WHICH YOU RECEIVE THE LAST OF ALL DOCUMENTS REQUIRED TO BE GIVEN TO YOU PURSUANT TO SECTION 721.07(6), FLORIDA STATUTES, WHICHEVER IS LATER. IF YOU DECIDE TO CANCEL THIS CONTRACT, YOU MUST NOTIFY THE SELLER IN WRITING OF YOUR INTENT TO CANCEL. YOUR NOTICE OF CANCELLATION SHALL BE EFFECTIVE UPON THE DATE SENT AND SHALL BE SENT TO MARRIOTT OWNERSHIP RESORTS, INC., ATTN: MANAGER, SALES ADMINISTRATION, 7000 GRAND HORIZONS BOULEVARD, ORLANDO, FLORIDA 32821. ANY ATTEMPT TO OBTAIN A WAIVER OF YOUR CANCELLATION RIGHTS IS VOID AND OF NO EFFECT. WHILE YOU MAY EXECUTE ALL CLOSING DOCUMENTS IN ADVANCE, THE CLOSING, AS EVIDENCED BY DELIVERY OF THE DEED OR OTHER DOCUMENT, BEFORE EXPIRATION OF YOUR 10-DAY CANCELLATION PERIOD, IS PROHIBITED.**

---

SALVATORE J. DE SANTIS     4-11-06

---

JO DE SANTIS     4-11-06

---

WITNESSES SIGN ABOVE

SALES EXECUTIVE:
Clyde Johnson

PURCHASERS SIGN ABOVE     DATE

Marriott Ownership Resorts, Inc. Authorized Representative     DATE   4/4/06

MARRIOTT OWNERSHIP RESORTS, PROCUREMENT, L.L.C.,
a Delaware limited liability company

By: _____ Date 4/4/06
Authorized Representative

The term "Notify" as used above means any written notice of cancellation which is delivered by any means, including certified mail return receipt requested, to the developer.

1. **TIMESHARE PLAN.** The Timeshare Plan being offered by the Developer is what is commonly referred to as "interval ownership" which is a deeded interest in real estate known as a timeshare estate consisting of a revolving estate for years through the first Thursday in the Year 2060 (unless extended pursuant to the Declaration of Condominium) and a remainder interest in perpetuity as a tenant-in-common with all other Owners of timeshare estates in a given Unit. The Purchaser should refer to the Public Offering Statement promulgated by the Developer pursuant to Chapter 721, Florida Statutes, (the "Public Offering Statement") for a full explanation of the Timeshare Plan being offered. Each Unit committed to the Timeshare Plan contains fifty-two (52) timeshare periods consisting of a Unit Week each. Unit Week #1 is the seven (7) days commencing on the first Thursday in a calendar year. Unit Week #2 is the seven (7) days succeeding. Additional weeks up to and including Unit Week #52 are computed in a like manner. Any excess days not otherwise assigned shall be retained by Seller subject to the provisions of the Declaration of Condominium. With the exception of Use Week #52 for which the timeshare period each year is fixed (but the check-in time may vary), all timeshare estates sold by Seller are subject to "Floating Time" as set forth in the Declaration of Condominium wherein owners of timeshare estates, although deeded a specific timeshare estate with an associated timeshare period under the Timeshare Plan, are restricted as to the period of time they can use the accommodations and facilities of the Timeshare Plan. Unit Weeks run from 10:00 a.m. on the first Thursday of the Unit Week assigned to 10:00 a.m. on the last Thursday or such other first and last day of the Unit Week as provided for under the Reservation Procedures. Occupancy of a Unit is governed by the Declaration of Condominium, the Bylaws, and the Condominium Rules and Regulations, and it shall not commence until 4:00 p.m. on the first day of the timeshare period.

2.     **DISCONTINUANCE OF TIMESHARE PLAN.** Notwithstanding anything contained herein to the contrary, Seller reserves the right to terminate this Contract prior to closing by refunding the deposit paid hereunder within one hundred eighty (180) days after the date the first Purchaser signed a Contract to purchase a timeshare estate in the phase of the Condominium that contains the Unit described above in the event Seller does not pre-sell one hundred percent (100%) of the total number of timeshare estates contained in said phase. Under such circumstances, Seller shall return to the Purchaser all sums theretofore paid hereunder, and upon making such payment, neither party shall have any further rights, obligations, or liabilities with respect to the other party under this Contract.

3.     **MODIFICATIONS AND CHANGES.** Seller reserves the right to make changes in the Declaration of Condominium, provided those changes do not decrease Purchaser's share in the common elements, change his voting rights or increase his share of common expenses except as permitted by the Declaration of Condominium. Notwithstanding the foregoing, Seller may, in its sole discretion, add subsequent phases as provided in the Declaration of Condominium affecting the shares of the common elements. Each Unit shall be substantially similar to the furnished model(s) described in Exhibit A to the Declaration of Condominium; however, the Seller shall have the right to substitute materials, furnishings, furniture, appliances, and fixtures of similar quality, utility, or color.

4.     **CREDIT REPORT.** Purchaser agrees that Seller shall have the right, but not the obligation, to obtain from consumer reporting agencies such information relating to the credit worthiness of Purchaser as Seller shall deem appropriate.

5.     **TITLE INSURANCE.** As soon as possible after the closing, Seller shall cause to be issued to Purchaser an owner's title insurance policy insuring the Purchaser's title to the timeshare estate(s) purchased, subject only to the conditions of title set forth herein. If Seller is unable to deliver insurable title, for any reason other than actions of Purchaser, Seller shall refund to Purchaser all monies paid under this Contract, and thereupon neither party shall have any further rights or obligations hereunder. Title insurance is available from Marriott Resorts Title Company, Inc. ("MRTC"), a wholly owned subsidiary of the Seller. The rates are available from MRTC. Seller will have the standard exception for the filing of mechanics' and/or materialmen's liens removed and/or otherwise make certain that adequate provisions are taken to address the filing of these so as to fully protect the Purchaser's rights. Purchaser should consult with his closing agent as to title insurance costs if a different closing agent and/or title agent other than Seller or MRTC is used.

6.     **BINDING EFFECT.** This Contract is binding upon the parties hereto and their heirs, legal representatives, successors, and assigns and may not be assigned by Purchaser without written consent of Seller. This Contract and the Public Offering Statement and Exhibits represent the entire agreement between the parties. This Contract may only be amended in writing, signed by all parties. Purchaser may not record this Contract or any memorandum hereof. The recording of same by Purchaser shall constitute a breach, and Seller, at its option, may thereupon terminate this Contract.

7.     **DEFAULT.** Time is of the essence except where otherwise provided herein. Upon Purchaser's breach of any term or condition of this Contract, Seller may elect   to   terminate this Contract and may retain all sums paid hereunder as its sole and exclusive remedy. Should Seller not substantially complete the accommodations and facilities being offered or otherwise be in default hereunder, then Purchaser shall be entitled to: (1) a return of all sums heretofore paid hereunder, and upon receipt of such payment by Purchaser, neither party shall have any further rights, obligations or liabilities with respect to the other party under this Contract; or (2) such other remedies as may be available by law to Purchaser, including, but not limited to, specific performance. In the event Seller defaults after exercising its right to close prior to completion of construction as provided in Paragraph 10 below, as a precondition to receiving the return of all funds paid hereunder, Purchaser shall be obligated to convey the timeshare estate back to Seller free from any liens and encumbrances, other than a purchase money mortgage in favor of Seller, which attached to the timeshare estate subsequent to Purchaser's initial acquisition of title.

8.     **CANCELLATION.** In the event Purchaser cancels this Contract during the 10-day cancellation period, Seller will refund to Purchaser the total amount of all payments made by Purchaser under this Contract, reduced by the proportion of any contract benefits Purchaser has actually received under this Contract prior to the effective date of the cancellation. The refund shall be made within twenty (20) days of demand therefore by the Purchaser, or within five (5) days after receipt of funds from Purchaser's cleared check, whichever is later. Purchaser agrees to return to Seller the Ownership Album, not including the Purchaser Public Offering Statement (if it was received) in connection with executing this Contract.

9.     **EXCHANGE PROGRAM.** Seller has executed an agreement with Interval International, Inc. ("Interval"), which provides for a reciprocal exchange program for owners of timeshare estates. Seller, at its sole expense, has paid the Developer's application fee therefore permitting Purchaser to join the program in the future. Seller makes no representations as to Interval, and all representations set forth within the brochures and literature of Interval are representations of Interval and not of Seller. Seller will pay Purchaser's initial membership fee for the timeshare estate(s) purchased. Thereafter, membership in the exchange program offered by Interval, or any other exchange program, is at the option and expense of Purchaser. Although Seller has entered into a multi-year agreement with Interval, Seller has retained the right to change its exchange program affiliation at a future date.

10.    **CLOSING AND TITLE.** Purchaser and Seller shall execute closing documents and deliver such documents, together with any funds required to close the transaction, to the closing agent, upon request by the closing agent. MRTC shall act as closing agent, unless Purchaser requests a different closing agent, in which case Purchaser shall pay any increased closing costs as set forth under Paragraph III (front) in connection with using such closing agent. Closing documents will either be executed at the time of execution of this Contract and held in escrow until closing when closing funds are sent, or the closing will be handled entirely by mail. Written notice of the closing date will be given by Seller to Purchaser not less than ten (10) days prior to the date specified in the notice if closing documents and/or funds must be furnished to closing agent. At closing, Seller shall deliver to Purchaser its special warranty deed conveying title to the timeshare estate(s) purchased free and clear of all liens, claims, and encumbrances, except Purchaser's mortgage (if any), the terms and conditions of the Declaration of Condominium, conditions, restrictions, covenants, reservations, limitations, zoning, and easements of record at the time of closing, taxes for the then current and subsequent years and liens created by actions of Purchaser. If alternate assurances are obtained and approved by the Division of Florida Land Sales, Condominiums and Mobile Homes, then at Developer's election and sole discretion, the purchase of a timeshare estate may be closed prior to completion of construction of the Units and amenities contained in the phase of the Condominium in which the timeshare estate is located, as permitted by Section 721.08(5)(b), Florida Statutes.

11.    **NO WARRANTIES.** Seller makes no warranties, express or implied, including but not limited to warranties of merchantability and fitness for a particular purpose, concerning the Units, personal property or the common elements except all governing valid statutory warranties.

12.    **ESCROW OF DEPOSITS.** Unless an approved alternate assurance arrangement is utilized, all deposits made hereunder shall be held by SunTrust Bank, Central Florida, National Association, 225 East Robinson Street, Suite 350, Orlando, Florida 32801 as Escrow Agent, until the expiration of the cancellation period as provided on the reverse side hereof. Provided Purchaser has not elected to exercise his rights thereunder, Escrow Agent shall further hold all deposits until presentation of an affidavit by Seller to Escrow Agent stating that the cancellation period has expired, construction is complete, and closing has occurred at which time Escrow Agent shall transfer said deposits to Seller. Interest earned on deposits held in escrow shall be paid to Seller. All notices and claims of Purchaser with respect to the above escrow shall be sent to Escrow Agent at the address set forth above.

13.    **MODEL UNITS:  CONTINUATION OF SALES PROGRAM.** After the Timeshare Plan is established, Purchaser consents to Seller using one or more Units owned by it as models, to the use of such reasonable signs as may be necessary to aid the Seller in the continuation of its sales program, and to such use of the common elements as may be necessary for Seller to complete its said sales program.

14.     **RISK OF LOSS.** Partial loss or damage to said Unit by fire, storm, or other casualty between the date hereof and closing hereunder shall not void or impair this Contract, but all such damage by way of fire, storm, or other casualty is to be the responsibility of the Seller. In the event of substantial or total loss prior to closing as a result of the hazards mentioned above, Purchaser shall have the option to cancel this Contract upon written notice to Seller within seven (7) days following the Purchaser's notification of such loss or damage.

15.     **PURCHASER'S REPRESENTATIONS AND COVENANTS AS TO FOREIGN NATIONAL STATUS.** The United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"), prohibits Seller from engaging, directly or indirectly, in transactions with individuals or entities on OFAC's list, as updated from time to time, of Specially Designated Nationals and Blocked Persons (the "SDN List"). OFAC also administers, from time to time, sanction and embargo programs involving certain designated countries (each an "Embargoed Country").

a.      By signing above, Purchaser represents and warrants to Seller as follows:

1.      Purchaser is not included on the SDN List, and is not owned or controlled by, or acting for or on behalf of, any individual, organization or other entity included on the SDN List.

2.      Purchaser is not a resident or national of any Embargoed Country.

3.      Purchaser is not affiliated with, and does not give support to or receive support from, any terrorist, terrorist organization, narcotics trafficker or person engaged in activities related to the proliferation of weapons of mass destruction.

4.      Purchaser is not an individual, organization or other entity with whom Seller or its affiliates are prohibited from transacting business, or with whom they may transact business only subject to the imposition of significant fines or penalties.

5.      Purchaser hereby represents its compliance with all applicable anti-money laundering laws, including, without limitation, the USA Patriot Act, and the laws administered by OFAC, including, without limitation, Executive Order 13224.

6.      None of Purchaser's employees, directors, officers, or others with a controlling interest in Purchaser, nor any of its affiliates or the funding sources of either is on the SDN List.

7.      Neither Purchaser nor any of its affiliates is directly or indirectly controlled by the government of any country or person that is subject to an embargo by the United States government that prohibits Seller from conducting the business activities contemplated by this Agreement with Purchaser.

8.      Neither Purchaser nor any of its affiliates is acting on behalf of an Embargoed Country.

Purchaser agrees that it will notify Seller in writing immediately upon the occurrence of any event which would render the foregoing representations and warranties of this Paragraph 15 incorrect. Notice should be sent by mail to the following address: Marriott Vacation Club International Attn: Law Department 6649 Westwood Blvd., Suite 110, Orlando, Florida 32821 and via confirmed telefacsimile at 407-206-6420.

b.      If at any time Purchaser becomes, or is discovered to be, an individual, organization or other entity described by any of Paragraph 15.a.1 through 15.a.8 above (a "Prohibited Purchaser"), Purchaser shall, immediately and without further action or notice on behalf of Seller, forfeit any use, voting and other rights attached to the property purchased hereby and shall not be entitled to a refund of any deposits, fees or other monies paid with respect to such property. Upon the occurrence of such an event, Purchaser shall waive any claims it may have against Seller and its parent and sister companies, affiliates, subsidiaries, employees, agents, officers and directors as a result of such forfeiture and will indemnify Seller and its parent and sister companies, affiliates, subsidiaries, employees, agents, officers and directors for any losses incurred by them arising from Purchaser's status as a Prohibited Purchaser, including any breach of Purchaser's representations and warranties set forth herein.

c.      Purchaser shall not transfer or attempt to transfer Purchaser's interest in the property purchased hereby to any individual, organization or other entity which would be considered a Prohibited Purchaser under the terms of this Agreement (a "Prohibited Transferee"). Any such transfer or attempted transfer may subject Purchaser to fines or other liabilities, and such transaction may be declared null and void. Purchaser hereby agrees to indemnify and hold harmless Seller and its parent and sister companies, affiliates, subsidiaries, employees, agents, officers and directors from any losses incurred by them arising from Purchaser's transfer or attempted transfer of Purchaser's interest in the property purchased hereby to any Prohibited Transferee.

16.     **SEVERABILITY.** If any portion of this Contract is held to be invalid or unenforceable for any reason whatsoever, all other provisions of this Contract shall, nevertheless, continue in full force and effect.

17.     **GOVERNING LAW; VENUE.** This Contract shall be governed by Florida law. Venue shall be in Orange County, Florida.

18.     **MANAGEMENT.** There is a Management Agreement between Marriott Resorts Hospitality Corporation and the Association for the management, maintenance and operation of the Condominium Property, which has an initial term of three (3) years, which agreement shall be automatically renewed for successive three-year periods until or unless terminated. The parties to said Management Agreement have the ability under certain conditions set forth in the Declaration of Condominium, Bylaws or Management Agreement to make operational decisions which could result in an increase in maintenance fees.

19.     **RADON GAS.** Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

20.     **FLORIDA BUILDING ENERGY-EFFICIENCY RATING ACT.** Pursuant to the Florida Building Energy-Efficiency Rating Act, Part XI, Chapter 553, Florida Statutes, Purchaser may have the energy-efficiency rating of the Unit subject to this Contract determined. The cost for obtaining this rating is the responsibility of the Purchaser. By execution of this Contract, Purchaser acknowledges receipt of the Department of Community Affairs' information brochure regarding Florida's Energy-Efficiency Rating System.

21.     **INSULATION.** Pursuant to the Federal Trade Commission's Trade Regulation Rule on Labeling and Advertising of Home Insulation (16 C.F.R., Part 460), set forth below is information planned for Units in the Condominium:

| LOCATION | TYPE | THICKNESS | R-VALUE |
|---|---|---|---|
| Trusses | Batt | 6" | 19 |
| Exterior Walls | Rigid Insul. Board | ¼" | 3.5 |
| Common, End Walls | Rigid Insul. Board | ¼" | 3.5 |
| Roof | Rigid Insul. Board | 3 ¼" (Avg.) | 19 |

22.     **CONSTRUCTION DEFECT CLAIMS. FLORIDA LAW CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY FILE A LAWSUIT FOR DEFECTIVE CONSTRUCTION AGAINST A CONTRACTOR, SUBCONTRACTOR, SUPPLIER, OR DESIGN PROFESSIONAL FOR AN ALLEGED CONSTRUCTION DEFECT IN YOUR HOME. SIXTY DAYS BEFORE YOU FILE YOUR LAWSUIT, YOU MUST DELIVER TO THE CONTRACTOR, SUBCONTRACTOR, SUPPLIER, OR DESIGN PROFESSIONAL A WRITTEN NOTICE OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE YOUR CONTRACTOR AND ANY SUBCONTRACTORS,**

SUPPLIERS, OR DESIGN PROFESSIONALS THE OPPORTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS AND MAKE AN OFFER TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER MADE BY THE CONTRACTOR OR ANY SUBCONTRACTORS, SUPPLIERS, OR DESIGN PROFESSIONALS. THERE ARE STRICT DEADLINES AND PROCEDURES UNDER FLORIDA LAW.

23.      COMMON FURNISHINGS.      In accordance with Paragraph 1 hereinabove, Common Furnishings are the furniture, appliances and equipment which are contained in Units for the benefit and use of Owners, guests, renters and other authorized users of the accommodations and facilities the Component Site Timeshare Plan. Common Furnishings in each Unit(s) shall have a value at least comparable to that contained in the model Units (if any); provided, however, that the Common Furnishings in each Unit need not be identical to those contained in the models.

**For the purpose of ad valorem assessment, taxation and special assessments, the managing entity will be considered the taxpayer as your agent pursuant to Section 192.037, Florida Statutes.**

## AMENDMENT TO CONTRACT FOR PURCHASE

This AMENDMENT is that certain Contract for Purchase dated the 11th day of April, 2006 , and is entered into by  and  between Salvatore J. & Jo C. De Santis (Purchaser(s) and MARRIOTT OWNERSHIP RESORTS, INC., (Seller) this 11th day of April, 2006.

    1.    The Contract for Purchase for Unit(s)2914 Week(s) 22 at Horizon's dated April 11 , 2006 executed by and between the undersigned parties is hereby incorporated by reference as if fully set forth herein and each of the terms and conditions thereof shall remain in full force and effect unless specifically modified herein. In the case of conflict between the Contract for Purchase and this Amendment, the Amendment shall control.

    2.    The additional deleted and/or modified terms of the afore-described Contract for Purchase are set forth hereunder as follows:

The sum of $ 1,395.00 included in the deposit identified on the Contract for Purchase is being credited to purchaser(s) by seller pursuant to Marriott Vacation Club International's Privileges Package Program. Notwithstanding, any contrary provision contained in this contract, in the event purchasers(s) cancels this contract or the transaction does not close, the sum of $1,395.00 included in the deposit and which is being credited to purchaser(s) by seller pursuant to the Privileges Package Program shall not be refunded to purchaser(s) under the terms of the contract."

All other terms and conditions of the original contract will remain in full force and effect.

WITNESSES:              PURCHASER(S)        DATED:

_____    _____    4-11-06

_____    _____    4-11-06

SALES EXECUTIVE:      SELLER:
                          MARRIOTT OWNERSHIP RESORTS, INC.

_____    _____    4|11|06

2914/22

**HAO CONDOMINIUM**
**RECEIPT FOR TIMESHARE DOCUMENTS**

The undersigned acknowledges that the items listed below have been received and that timeshare plans and specifications have been made available for inspection.

| | | | | |
|---|---|---|---|---|
| X | Name of Plan | | X | HAO Rules and Regulations for Floating Time |
| X | Public Offering Statement Text | | X | Condominium Rules and Regulations |
| | | | X | Declaration of Condominium |
| X | Articles of Incorporation | | X | Percentage Interest in the Common Elements |
| X | Bylaws | | X | Estimated Operating Budget |
| X | Copy of Executed Purchase Contract | | X | Exchange Disclosure Documents (including): |
| X | Descriptive List of Documents Not Delivered to Purchasers | | | X Interval International, Inc. ("Interval") Directory |
| X | Other Documents (List) | | | X Interval Buyers Guide for Marriott Vacation Club International |

**YOU MAY CANCEL THIS CONTRACT WITHOUT ANY PENALTY OR OBLIGATION WITHIN TEN (10) CALENDAR DAYS AFTER THE DATE YOU SIGN THIS CONTRACT OR THE DATE ON WHICH YOU RECEIVE THE LAST OF ALL OF THE DOCUMENTS REQUIRED TO BE GIVEN TO YOU PURSUANT TO SECTION 721.07(6), FLORIDA STATUTES, WHICHEVER IS LATER. IF YOU DECIDE TO CANCEL THIS CONTRACT, YOU MUST NOTIFY THE SELLER IN WRITING OF YOUR INTENT TO CANCEL. YOUR NOTICE OF CANCELLATION SHALL BE EFFECTIVE UPON THE DATE SENT AND SHALL BE SENT TO MARRIOTT OWNERSHIP RESORTS, INC., ATTN: MANAGER, SALES ADMINISTRATION 7000 GRAND HORIZONS BOULEVARD, ORLANDO, FL 32821. ANY ATTEMPT TO OBTAIN A WAIVER OF YOUR CANCELLATION RIGHTS IS VOID AND OF NO EFFECT. WHILE YOU MAY EXECUTE ALL CLOSING DOCUMENTS IN ADVANCE, THE CLOSING, AS EVIDENCED BY DELIVERY OF THE DEED OR OTHER DOCUMENT, IS PROHIBITED FROM TAKING PLACE BEFORE EXPIRATION OF YOUR TEN (10) DAY CANCELLATION PERIOD.**

| | |
|---|---|
| [Purchaser] | 4-11-06 date |
| [Purchaser] | 4-11-06 date |
| [Purchaser] | date |
| [Purchaser] | date |

The documents listed in this receipt and received by the purchaser constitute a subset of the public offering statement filed with the Division of Florida Land Sales, Condominiums and Mobile Homes, in accordance with Chapter 721, Florida Statutes.

(HO.RECEIPT) 9.23.04

ACKNOWLEDGMENT AND DISCLOSURE STATEMENT

The following disclosures are made by the Developer, Marriott Ownership Resorts, Inc., of the HAO Condominium Development ("Development") with regard to the incidental benefit described below:

1. The HAO Condominium FlexAwards Program and the HAO Time-Share/Marriott Rewards® Program as more fully described by the Rules and Regulations for same, a copy of which is attached hereto as Exhibit A and Exhibit B, respectively, and also are incorporated herein by reference have a separate represented value of 1.568% of the sales price of a time-share estate in the Development and is subject to the user fees and costs and the restrictions upon use and availability as set forth in the attached Rules and Regulations.

2. Use of or participation in the aforedescribed incidental benefits by the Purchaser is completely voluntary and payment of any aforedescribed user fees or costs are only required upon actual use or participation by Purchaser in the applicable incidental benefits.

3. The incidental benefits described above are not assignable or otherwise transferable by a Purchaser.

4. If all or a portion of the aforedescribed incidental benefits become unavailable as the result of events beyond the control of the Developer, then the offering of such benefits may be terminated.

IN THE EVENT THE HAO CONDOMINIUM FLEXAWARDS PROGRAM OR THE HAO CONDOMINIUM TIMESHARE/MARRIOTT REWARDS® PROGRAM BECOME UNAVAILABLE AS A RESULT OF EVENTS BEYOND THE CONTROL OF THE DEVELOPER, THE DEVELOPER RESERVES THE RIGHT TO SUBSTITUTE A REPLACEMENT INCIDENTAL BENEFIT OF A TYPE, QUALITY, VALUE AND TERM REASONABLY SIMILAR TO THE UNAVAILABLE INCIDENTAL BENEFIT.

THE HAO CONDOMINIUM FLEXAWARDS PROGRAM AND THE HAO CONDOMINIUM TIMESHARE/MARRIOTT REWARDS PROGRAM ARE INCIDENTAL BENEFITS OFFERED TO PROSPECTIVE PURCHASERS OF THE TIMESHARE PLAN. THESE BENEFITS ARE AVAILABLE FOR YOUR USE FOR A TERM OF 3 YEARS OR LESS AFTER THE FIRST DATE THAT THE TIME-SHARE PLAN IS AVAILABLE FOR YOUR USE. THE AVAILABILITY OF THE INCIDENTAL BENEFITS MAY OR MAY NOT BE RENEWED OR EXTENDED. YOU SHOULD NOT PURCHASE AN INTEREST IN THE TIME-SHARE PLAN IN RELIANCE UPON THE CONTINUED AVAILABILITY OR RENEWAL OR EXTENSION OF THESE BENEFITS.

### ACKNOWLEDGMENT

The undersigned Purchaser(s) acknowledge that he/they have read the foregoing document and attached Exhibit A and Exhibit B.

| | |
|---|---|
| PURCHASER | PURCHASER |
| PURCHASER | PURCHASER |
| PURCHASER | PURCHASER |
| PURCHASER | PURCHASER |

Executed this _11th_ day of _April_ , _2006_ .

EXHIBIT A
## RULES & REGULATIONS FOR MARRIOTT'S HAO CONDOMINIUM
## FLEXAWARDS PROGRAM

These Rules and Regulations for the HAO Condominium FlexAwards Program ("Rules and Regulations") are promulgated this 29TH day of September, 2000, by Marriott Ownership Resorts, Inc. ("MORI") for the benefit of Eligible Owners (defined below) of time-share estates at HAO Condominium Development (the "Development") and supersede any previously published Rules and Regulations. The Rules and Regulations are as follows:

1.    **GENERAL**
a.    HAO Condominium FlexAwards Program ("Program") means that program established and operated by Marriott International, Inc., ("Marriott") for use by Marriott hotel and resort guests whereby they can receive certificates redeemable for hotel rooms at participating Marriott hotels and resorts in North America, as amended by MORI herein, for use by its Eligible Owners.
b.    All other terms used herein shall have the same meaning given to them in the documents creating the Development, as amended from time to time, and/or the Flex Anytime Award collateral published for the Flex Anytime Award program. The terms and conditions for the Flex Anytime Award program will be distributed separately from this document, and are incorporated herein by reference as if fully set forth.
c.    Neither MORI nor Marriott guarantees that an Eligible Owner participating in the Program will be able to stay at a particular participating Marriott hotel or resort during any specific date or time. Accommodations reserved through Flex Anytime Award Certificates are subject to availability.
d.    **MORI WILL CONTINUE THE PROGRAM FOR A TERM OF THREE (3) YEARS OR LESS, HOWEVER THE PROGRAM MAY BE TERMINATED AT ANY TIME THEREAFTER BY MORI PROVIDING WRITTEN NOTICE TO ELIGIBLE OWNERS. IN THAT EVENT, THE RIGHT TO TRADE A UNIT WEEK FOR FLEX ANYTIME AWARD CERTIFICATES WILL END. MARRIOTT MAY TERMINATE THE FLEX ANYTIME AWARDS PROGRAM, UPON WHICH THE PROGRAM IS BASED, AT ANY TIME. MORI RESERVES THE RIGHT TO CHANGE, LIMIT, MODIFY OR CANCEL ANY OF THE RULES, REGULATIONS, CONDITIONS, AWARDS OR AWARD LEVELS PERTAINING TO THE PROGRAM, WITH OR WITHOUT NOTICE, IN ITS SOLE DISCRETION, AT ANY TIME. THAT INCLUDES, WITHOUT LIMITATION, DECREASING THE NUMBER OF FLEX ANYTIME AWARD CERTIFICATES AN ELIGIBLE OWNER WILL RECEIVE FOR THE TRADE OF A UNIT WEEK. MARRIOTT ALSO HAS THE RIGHT TO CHANGE, LIMIT, MODIFY OR CANCEL THE FLEX ANYTIME AWARD TERMS AND CONDITIONS, AWARDS, AND AWARD LEVELS, WITH OR WITHOUT NOTICE, IN ITS SOLE DISCRETION, AT ANY TIME. THAT INCLUDES CHANGING AWARDS, ADDING BLACKOUT DATES, LIMITING ROOMS AVAILABLE AT ANY MARRIOTT HOTEL, RESORT OR SUITES FOR AN AWARD, OR CHANGING LOCATIONS SERVED BY MARRIOTT. IN THE EVENT THAT ANY OF THESE CONDITIONS OCCUR, OWNERS MAY NOT BE ABLE TO OBTAIN OR REDEEM CERTAIN AWARDCERTIFICATES.**
2.    **ELIGIBILITY AND PARTICIPATION**
a.    All redemption of Flex Anytime Award Certificates will be in accordance with the terms and conditions contained on the Flex Anytime Award Certificate.
b.    Only owners of time-share estates at the Development who acquire their interests directly from MORI or upon resales brokered by a subsidiary or affiliated company of MORI, or transferees of such owners by will or intestate succession, or present or future children of such owners who have otherwise succeeded to their parents' interest, or siblings, parents, grandparents, or spouse of such owners ("Eligible Owners") are eligible to participate in the Program. MORI, in its sole discretion, with or without prior notice, has the unilateral right to expand or contract the list of persons eligible to participate in the Program at any time in the future.
c.    Participation will not be allowed by Eligible Owners unless all outstanding maintenance fees, taxes, special assessments, and all other charges, including interest and late charges, if any, and housekeeping fees where these are not collected as part of the maintenance fee, have been paid in full to the Association and/or the Management Company charged with the responsibility of operating and managing the Development.
d.    Participation will not be allowed by Eligible Owners with delinquent mortgage payments to MORI, or who are otherwise in default under their purchase money note and mortgage, if any, to MORI or who fail to pay any Marriott or subsidiary's hotel bill or account when due.
e.    To preclude problems concerning occupancy of a unit by a purchaser of a timeshare estate from an Eligible Owner during an assigned unit week should the right to use be assigned to MORI under this Program in return for Flex Anytime Award Certificates, MORI, in its sole discretion, may deny participation in the Program to Eligible Owners who have listed their timeshare estates for resale.
f.    MORI, in its sole discretion, may deny participation in the Program to Eligible Owners who have reserved a unit week and who subsequently wish to assign their unit week in return for Flex Anytime Award Certificates, or may charge an additional fee for such service.
3.    **ASSIGNMENT PROCEDURES**
       An Eligible Owner desiring to assign his unit week for Flex Anytime Award Certificates through the Program must notify MORI at any time in the year before the use year to be assigned that he desires to assign his right to use of a unit at the Development to MORI in return for Flex Anytime Award Certificates. Payment of an appropriate fee as established by MORI, from time to time, is required for this transaction. Assignments of the right to use in return for Flex Anytime Award Certificates more than one year in advance of the start of the use year in question will not be permitted. Flex Anytime Award Certificates will become available for use at the start of the use year being assigned and will have a term of fifteen (15) months from the end of the month in which the certificate is issued.

09.00 (HAO.FLEXAWARDS)

4.    **HAO CONDOMINIUM FLEXAWARDS LEVEL SCHEDULE**

The award of Flex Anytime Award Certificates for trade of a unit week will be based upon the season designation of the timeshare estate purchased. The option to trade the use of a designated unit week at the Development for Flex Anytime Award Certificates, or any other incidental benefit offered by the Developer, shall be limited to non-successive use years; i.e., trades may not be made two (2) years in a row, or in the case of an every-other-year Eligible Owner, at least three (3) years must separate use years in which trades are made. In the event an Eligible Owner elects to trade his unit week at the Development for Marriott Rewards points pursuant to the HAO Condominium Timeshare/Marriott Rewards Program, the Eligible Owner shall not have the option of trading his unit week at the Development for Flex Anytime Award Certificates with regard to the same or successive use years. The number of Flex Award Certificates which may be received for assignment of a unit week per season designation at the Development are as follows:

| Season  (Weeks) | Flex Anytime Certificate |
|---|---|
| Platinum Plus (52) | 7 - One Night Certificates |
| Platinum (1-17,22-34,51) | 6 - One Night Certificates |
| Gold (18-21,35-50) | 4 - One Night Certificates |

Purchaser(s) Initials:

09.00 (HO FLEXAWARDS)

4.      **HAO CONDOMINIUM TIMERSHARE/MARROITT REWARDS POINTS AWARD LEVEL SCHEDULE**

The award of Marriott Rewards points for trade of a unit week will be based upon the season designation of the timeshare estate purchased. The option to trade the use of a designated unit week at the Development for Marriott Rewards points, or any other incidental benefit offered by the Developer, shall be limited to non-successive use years; i.e., trades may not be made two (2) years in a row, or in the case of an every-other-year Eligible Owner, at least three (3) years must separate use years in which trades are made. In the event an Eligible Owner elects to trade his unit week at the Development for Flex Anytime Award Certificates, the Eligible Owner shall not have the option of trading his unit week at the Development for Marriott Rewards Points with regard to the same or successive use years. The Marriott Rewards points which may be received for assignment of a unit week per season at the Development are as follows:

| Season (Weeks) | Marriott Rewards Points |
| --- | --- |
| Platinum Plus (52) | 75,000 |
| Platinum (1-17, 22-34, 51) | 70,000 |
| Gold (18-21, 35-50) | 60,000 |

Purchaser(s) Initials: _____

EXHIBIT B
## RULES & REGULATIONS FOR MARRIOTT'S HAO CONDOMINIUM
### TIME-SHARE/MARRIOTT REWARDS® PROGRAM

These Rules and Regulations for the Time-Share/Marriott Rewards Program ("Rules and Regulations") are promulgated this July 25, 2003, by Marriott Ownership Resorts, Inc. ("MORI") for the benefit of Eligible Owners (defined below) of timeshare estates at HAO Condominium Development (the "Development") and supersede any previously published Rules and Regulations. The Rules and Regulations are as follows:

1.      **GENERAL**

a.      HAO Condominium Time-share/Marriott Rewards Program ("Program") means that program established and operated by Marriott International, Inc., ("Marriott") for use by Marriott hotel and resort guests whereby they can accumulate points redeemable for, among other things, hotel rooms at participating Marriott hotels and resorts worldwide, airline tickets and car rentals from Marriott travel partners, as amended by MORI herein, for use by its Eligible Owners.

b.      All other terms used herein shall have the same meaning given to them in the documents creating the Development, as amended from time to time, and/or the Marriott Rewards Program collateral published for the Marriott Rewards Program. The rules for the Marriott Rewards Program will be distributed separately from this document, and are incorporated herein by reference as if fully set forth. (See current Marriott Rewards Membership Guide.)

c.      Neither MORI nor Marriott guarantees that an Eligible Owner participating in the Program will be able to stay at a particular participating Marriott hotel or resort during any specific time. Over demand at various participating Marriott hotels and resorts may result in "black out" dates during certain seasons of the year resulting in Eligible Owners desiring to stay at a particular Marriott hotel or resort during a particular season not being able to do so.

d.      MORI WILL CONTINUE THE PROGRAM FOR A TERM OF THREE (3) YEARS OR LESS, HOWEVER THE PROGRAM MAY BE TERMINATED AT ANY TIME THEREAFTER BY MORI PROVIDING WRITTEN NOTICE TO ELIGIBLE OWNERS. IN THAT EVENT, THE RIGHT TO TRADE A UNIT WEEK FOR MARRIOTT REWARDS POINTS WILL END. MARRIOTT MAY TERMINATE THE MARRIOTT REWARDS PROGRAM, UPON WHICH THE PROGRAM IS BASED, AT ANY TIME, AS DESCRIBED IN THE THEN-CURRENT MARRIOTT REWARDS MEMBERSHIP GUIDE.

e.      MORI RESERVES THE RIGHT TO CHANGE, LIMIT, MODIFY OR CANCEL ANY OF THE RULES, REGULATIONS, CONDITIONS, AWARDS OR AWARD LEVELS PERTAINING TO THE PROGRAM, WITH OR WITHOUT NOTICE, IN ITS SOLE DISCRETION, AT ANY TIME. THAT INCLUDES, WITHOUT LIMITATION, DECREASING THE NUMBER OF MARRIOTT REWARDS POINTS AN ELIGIBLE OWNER WILL RECEIVE FOR THE TRADE OF A UNIT WEEK. MARRIOTT AND ITS TRAVEL PARTNERS ALSO HAVE THE RIGHT TO CHANGE, LIMIT, MODIFY OR CANCEL THE MARRIOTT REWARDS PROGRAM RULES, REGULATIONS, AWARDS, AND AWARD LEVELS, WITH OR WITHOUT NOTICE, IN ITS SOLE DISCRETION, AT ANY TIME. THAT INCLUDES INCREASING LEVELS OR NUMBER OF POINTS REQUIRED FOR AN AWARD, CHANGING AWARDS, ADDING BLACKOUT DATES, LIMITING ROOMS AVAILABLE AT ANY MARRIOTT HOTEL, RESORT OR SUITES FOR AN AWARD, CHANGING LOCATIONS SERVED BY MARRIOTT OR BY ITS TRAVEL PARTNERS, OR CHANGING OR CANCELING ITS TRAVEL PARTNER AWARDS. IN THE EVENT THAT ANY OF THESE CONDITIONS OCCUR, MEMBERS MAY NOT BE ABLE TO OBTAIN CERTAIN AWARDS.

2.      **ELIGIBILITY AND PARTICIPATION**

a.      Upon the purchase from MORI of a timeshare estate by a purchaser, MORI will forward the enrollment information to Marriott for establishment of a Marriott Rewards account if the purchaser is not already a Marriott Rewards member. All redemption of Marriott Rewards points will be in accordance with the procedures outlined in the Marriott Rewards Membership Guide. A Marriott Rewards account may be maintained in the name of each owner of record whose name appears in the deed; however, points will be credited to only one account, and not multiple accounts, based upon direction received by MORI from the owners where title is held by more than one individual.

b.      Only owners of timeshare estates at the Development who acquire their interests directly from MORI or upon resales brokered by a subsidiary or affiliated company of MORI, or transferees of such owners by will or intestate succession, or present or future children of such owners who have otherwise succeeded to their parents' interest, or siblings, parents, grandparents, or spouse of such owners ("Eligible Owners") are eligible to participate in the Program. MORI, in its sole discretion, with or without prior notice, has the unilateral right to expand or contract the list of persons eligible to participate in the Program at any time in the future.

c.      Participation will not be allowed by Eligible Owners unless all outstanding maintenance fees, taxes, special assessments, and all other charges, including interest and late charges, if any, and housekeeping fees where these are not collected as part of the maintenance fee, have been paid in full to the Association and/or the Management Company charged with the responsibility of operating and managing the Development.

d.      Participation will not be allowed by Eligible Owners with delinquent mortgage payments to MORI, or who are otherwise in default under their purchase money note and mortgage, if any, to MORI.

e.      To preclude problems concerning occupancy of a unit by a purchaser of a timeshare estate from an Eligible Owner during an assigned unit week should the right to use be assigned to MORI under this Program in return for Marriott Rewards points, MORI, in its sole discretion, may deny participation in the Program to Eligible Owners who have listed their time-share estates for resale.

f.      Assignment of Marriott Rewards points by Eligible Owners to third parties is not permitted.

g.      MORI, in its sole discretion, may deny participation in the Program to Eligible Owners who have reserved a unit week and who subsequently wish to assign their unit week in return for Marriott Rewards points, or may charge an additional fee for such service.

3.      **ASSIGNMENT PROCEDURES**

An Eligible Owner desiring to assign his unit week for Marriott Rewards points through the Program must notify MORI at any time in the year before the use year to be assigned that he desires to assign his right to use of a unit at the Development to MORI in return for Marriott Rewards points. Payment of an appropriate fee as established by MORI, from time to time, is required for this transaction. Assignments of the right to use in return for Marriott Rewards points more than one year in advance of the start of the year in question will not be permitted. Marriott Rewards points will become available for use at the start of the use year that is assigned.

**SPECIAL WARRANTY DEED**

THIS DEED, made on this _____, by and between, MARRIOTT OWNERSHIP RESORTS, INC. , a Delaware corporation, (hereinafter referred to as "Grantor"), whose post office address is 6649 Westwood Boulevard – Suite #500, Orlando, FL 32821-6090 and SALVATORE J. DE SANTIS, Individual (hereinafter referred to as "Grantee"), whose post office address is c/o Marriott Resorts Hospitality Corporation, 6649 Westwood Boulevard – Suite #500, Orlando, FL 32821-6090.

**WITNESSETH:**

That the Grantor, in consideration of Ten and No/100 Dollars ($10), and other good and valuable consideration to it, paid by the Grantee, the receipt of which is acknowledged, has granted, bargained and sold, and does grant, bargain, and sell unto the Grantee, its heirs, devisees, successors and assigns forever, the following described timeshare estate(s) from 10:00 a.m. of the first day until 10:00 a.m. on the last day assigned to Grantee during the below described timeshare period(s) as said timeshare period(s) is numbered and defined in the Declaration of Condominium recorded in Public Records of Orange County, Florida, in the Book and at the Page Number hereafter described below, which estate is to be succeeded by a succession of other estates in consecutive and chronological order, revolving among the other timeshare periods described in the Declaration of Condominium, in order annually or biennially, as the case may be, it being the intent of this instrument that each timeshare period shall be considered a separate estate held separately and independently by the respective owners for and during the period of time assigned to each in the Declaration of Condominium, each estate being succeeded by the next in unending succession governed by the Declaration of Condominium until 10:00 a.m. on the first Saturday in 2060, at which date said estate shall terminate unless extended in accordance with the provisions of the Declaration of Condominium;

TOGETHER with a remainder over in fee simple absolute, as tenant in common with the other owners of all the timeshare estates in the hereafter described condominium parcel in that percentage interest determined and established by the Declaration of Condominium for the following described real estate located in Orange County, State of Florida, together with an undivided interest in the common elements and limited common elements appurtenant thereto, as follows:

| Unit Week | In Unit |
|-----------|---------|
| 22        | 2914    |

,in HAO Condominium, according to the Declaration of Condominium thereof, as recorded in Official Records Book 6017 at Page 0143 in the Public Records of Orange County, Florida, and any amendments thereof.

This conveyance is subject to and by accepting this deed Grantee agrees to assume the following:

1.      Taxes for the current year and subsequent years.
2.      Declaration of Condominium of HAO Condominium, and Exhibits attached thereto, and any amendments thereof.
3.      Conditions, restrictions, limitations, reservations, easements, and other matters of record.

The benefits and obligations hereunder shall inure to and be binding upon the heirs, executors, administrators, successors and assigns of the respective parties hereto. The Grantor fully warrants the title to said land, and will defend the same against the lawful claims of all persons claiming by, through or under said Grantor.

Prepared by and return to:   Angela D. McGee, Marriott Resorts Title Company,
                             1200 Highway 98 South, Lakeland, FL 33801

(HO.WARRANT.DEED) 06.15.00

IN WITNESS WHEREOF, MARRIOTT OWNERSHIP RESORTS, INC. has caused these presents to be signed in its name by its proper officer on the date first written above.

WITNESSES:

MARRIOTT OWNERSHIP RESORTS, INC.

By: _____

Name: _____

Title: Manager, New Owner Administration
P.O. Box 24747
Lakeland, Florida 33802
(Corporate Seal)

STATE OF FLORIDA )
COUNTY OF POLK  )

The    foregoing    instrument    was    acknowledged    before    me    this _____ by _____ of MARRIOTT OWNERSHIP RESORTS, INC., a Delaware corporation, on behalf of the corporation by authority of a corporate resolution recorded in the Public Records of Orange County, Florida. She/he is personally known to me.

(Print Name): _____
Notary Public, State of Florida
Commission No: _____
Commission Expires: _____

(HO.WARRANT.DEED) 06.15.00