**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | | |
|---|---|---|
| **SALVATORE DESANTIS**, on behalf of himself and all others similarly situated, | ) | |
| Plaintiff, | ) | Civil Case No.: 6:14-cv-00733-GAP-KRS |
| v. | ) | |
| **MARRIOTT OWNERSHIP RESORTS, INC.**, db/a Marriott Vacation Club International, | ) | **AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Defendant. | ) | |

## AMENDED CLASS ACTION COMPLAINT

Plaintiff, Salvatore DeSantis, on behalf of himself and the Class described below, brings the following claims against Defendant Marriott Ownership Resorts, Inc., d/b/a Marriott Vacation Club International ("Marriott").

## NATURE OF THE ACTION

1. This is a civil action seeking monetary damages, restitution, and injunctive and declaratory relief from Marriott for using unfair, deceptive, and unconscionable means to impair the value and rights of Marriott Vacation Club members' timeshare interests to extract more money for "upgraded plans."

2. Marriott is a corporation that licenses the "Marriott" name from Marriott International, Inc. and its affiliates. Its business consists of selling timeshares and it claims to be "the leader in the vacation ownership industry."

3. A timeshare is a property interest in resort real estate for a specified time each year or biannually. Marriott's timeshare plan sold to DeSantis and putative class members is

known as “interval ownership,” where purchasers of timeshares receive a deeded interest in a particular piece of property for a set week of each year.

4. With their timeshares, Marriott Vacation Club members may occupy the property during specified annual timeframes.

5. Marriott baited customers into the Marriott Vacation Club through a material promise of flexibility and variety in vacation destinations. It promised its Vacation Club Members the ability to trade their allotted week at their deeded property with that of another Marriott Vacation Club Member. This system (the “Weeks Program”) allowed members to travel to locations other than their primary deeded property and at times other than their allotted week of the year. By offering this benefit, Marriott was able to convince customers to pay substantial sums of money for a timeshare, along with costly (and ever-rising) annual maintenance fees.

6. The Weeks Program facilitated the exchange between members by establishing a program where they would deposit their timeshare interests with a third party exchange company—Interval International. Once deposited, members have priority access to other Weeks Program members’ timeshare interests that have also been deposited for exchange through Interval International.

7. In 2010, Marriott made a decision to stop offering the Weeks Program to customers. Instead, it offered a new exchange system, the Destination Points Program (the “Points Program”). In the Points Program, Marriott Vacation Club members purchase a deeded property interest, just as before, but now with it they receive an annual allotment of Vacation Club Points to use at Marriott Vacation Club resorts. Instead of trading their allotted week at

their deeded property for that of another member, members in the Points Program now use yearly allotted points to vacation in different resorts.

8. The Points Program is an in-house exchange system that Marriott operates. Thus, Marriott keeps for itself the profits it obtains through fees associated with exchanges, as Interval International did for trades made between Weeks Members.

9. The practical effect of this change has been devastating to Club Members in the Weeks Program. Without enrolling new members into the Weeks Program, the Club Members in the Weeks Program face an exponentially dwindling pool of members with whom they may trade, exacerbating the decline in economic and non-economic value to the Club Members.

10. Worse yet, Marriott specifically targeted Club Members in the Weeks Program for "upgrades" into the Points Program and instructed its sales representatives to denigrate the Weeks Program and pitch the Points Program instead. The Weeks Program no longer offers the trading power needed to obtain comparable exchanges. Moreover, as a result, Marriott has required Weeks Program members to buy into the Points Program to have access to other Marriott resorts. Marriott does not offer to convert its existing Weeks Program Club Members into a comparable position of value in the Points Program without charge. Instead, it charges a significant amount for Club Members in the Weeks Program to enter into the Points Program.

11. As a consequence of Marriott's hard sell effort targeted at Club Members in the Weeks Program, it has profited enormously by extorting additional money from its customers for something Marriott already sold them – the right to reasonably access Marriott Club resort locations across the globe using their timeshare. Furthermore, with each "upgrade" sale it makes to Club Members in the Weeks Program, Marriott further undercuts the market for exchanging

weeks and further devalues timeshares of those members that can only exchange through Interval International.

12. Marriott has, thus, forced the Marriott Vacation Club Members enrolled in the Weeks Program to choose between unappealing possibilities. They may accept that the once-robust trade network that permitted them to go on vacations to new and different places is now severely depleted and devalued or, in many cases, literally confines them to using only their deeded real estate. Alternatively, they may pay Marriott additional and substantial funds to receive a benefit they had already bargained and paid for or sell their timeshare interest back to Marriott for pennies on the dollar.

13. Marriott fraudulently, deceptively, and unconscionably deprived members in the Weeks Program of the very benefits it sold them through its implementation of the new Points Program.

## PARTIES

14. Plaintiff Salvatore DeSantis resides in Manalapan, New Jersey. Plaintiff became a Marriott Vacation Club member on April 11, 2006. Plaintiff paid $17,400 for his timeshare membership. At all relevant times, Plaintiff paid all membership fees and all other fees associated with his membership.

15. Defendant Marriott Ownership Resorts, Inc., d/b/a Marriott Vacation Club International, is a Delaware Corporation headquartered in Orlando, Florida and registered to do business in the State of Florida. It is listed as the "Seller" in Plaintiff's timeshare contract.

## JURISDICTION AND VENUE

16. This Court has jurisdiction over this case under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d)(2). Plaintiff is a citizen of New Jersey and Defendant is a citizen

of Florida. The amount in controversy in this action is more than $5,000,000 and the Class includes more 100 members. Marriott has, in fact, represented in its own papers that there are approximately 15,000 Class Members with ownership interests in Plaintiff's Orlando property alone.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391. Defendant regularly conducts business in this District, and is headquartered in this District.

## CLASS REPRESENTATION ALLEGATIONS

18. Plaintiff brings this class action on behalf of himself and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority prerequisites of Rule 23.

### A. The Proposed Class

19. Plaintiff seeks to represent the following Class of similarly situated persons:

> All purchasers of Marriott timeshare interests under the Weeks Program, who owned their timeshare interest when Marriott stopped selling time share interests under the Weeks Program, on June 20, 2010 (the "Class").

20. Excluded from the Class are: Marriott; Marriott's parents, subsidiaries, affiliates, officers and directors; any entity in which Marriott has a controlling interest; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

21. Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

### B. Numerosity

22. The members of the Class are so numerous that joinder is impractical. Upon information and belief, at the relevant time, Marriott had tens of thousands of timeshare interest

holders in the Weeks Program. The Court may ascertain the exact size of the Class and the identities of the individual members thereof through Defendant's records, which are in the exclusive control of Marriott.

23. This case centers on Defendant's devaluation of timeshare interests under the Weeks Program. Because the loss that each Class member has faced is relatively small, Class Members are not likely to prosecute individual lawsuits that would cost more in attorney fees to bring the suit than the actual individual claim for recovery.

24. Because of the various locations and large number of members of the Class, joinder of all members would be extremely difficult and inconvenient. Timeshare interest holders reside all over of the world.

25. In the interest of judicial economy, the Court should determine Defendant's liability for all Class members in a single action rather than having hundreds or thousands of cases for the same cause of action based on the same facts pending at the same time.

**C. Typicality**

26. Plaintiff's claims are typical of the claims of all members of the Class in that Plaintiff and each Class member is a Marriott Vacation Club timeshare interest holder under the Weeks Program which, as a result of Marriott's deceptive and unlawful conduct has plummeted in value.

27. Plaintiff's claims and the claims of each Class member are based on the same legal theories and arise from the same unlawful conduct.

28. Plaintiff has suffered the same injury as all Class members. Plaintiff has the same interest as every other Class member and has no interests antagonistic to the interests of any other Class member.

**D. Common Questions of Law and Fact**

29. This case presents many questions of law and fact common to Plaintiff and the Class which predominate over any questions that may affect individual members, including:

a. Whether Marriott engaged in deceptive business practices in connection with its advertising its timeshares;

b. Whether Marriott engaged in unconscionable commercial practices in connection with its attempt to force Marriott Vacation Club members in the Weeks Program to "upgrade" their timeshares to enjoy the benefits they originally bargained for;

c. Whether Marriott developed and implemented a coordinated and uniform marketing strategy designed to create and maintain the false impression among Plaintiff and the Class that their rights were not affected by ending the Weeks Program, while simultaneously trying to sell them an "upgrade" into the Points Program;

d. Whether Marriott's abuse of discretion in ending the Weeks Program and deflating the timeshare exchange market (that induced the Class to purchase their timeshares to begin with) violated the implied covenant of good faith and fair dealing;

e. Whether Marriott's failure to provide access to an exchange program that offers exchanges for comparable resorts breaches the express terms of the Contract;

f. Whether Marriott's deceptive and misleading advertising violates the FDUPTA;

g. Whether Marriott's practice, of devaluing the timeshares of Plaintiff and the Class, through the decreased quality and quantity of timeshares available to Plaintiff and the Class, in order to resell them the benefits they had already bargained for via their new Points Program, violates FDUPTA;

h. Whether Marriott acquired financial gain by means of conduct declared unlawful by FDUPTA.

**E. Adequacy of Representation**

30. Plaintiff is a member of the Class as defined above.

31. Through his attorneys, Plaintiff can and will fairly, adequately and vigorously prosecute the claims of the Class and represent and protect the interests of the members of the Class.

32. Plaintiff (i) held a timeshare interest under Marriott's Weeks Program; (ii) after the initiation of Marriott's Points Program, has found it increasingly difficult to exchange his timeshare for a desirable timeshare of equal quality; and, (iii) is unable to convert his timeshare membership to a comparable membership in the Points Program without paying an exorbitant amount of money.

33. Plaintiff has thus suffered the same injury as the Class members, that injury being the devaluation of timeshare interest of those in the Weeks Program through Marriott's decision to stop enrolling customers in the Weeks Program.

34. Plaintiff has the same interests as the Class members, including recovery of the lost value in their timeshares. Plaintiff has no interests antagonistic or in conflict with the members of the Class he seeks to represent.

35. Plaintiff has retained competent counsel and will fairly, adequately, and vigorously prosecute the claims of the Class and represent and protect the interest of the members of the Class. Plaintiff's counsel is able, competent and qualified to prosecute this class action litigation on behalf of Plaintiff and the Class.

**F. Predominance and Superiority**

36. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Marriott, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will continue to suffer a devaluation of their timeshare interests and Marriott will continue to unjustly reap rewards.

37. Even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

38. Common questions of law or fact predominate over individual issues. Predominant issues in this case include whether Defendant devalued timeshares owned by Plaintiff and members of the Class.

39. Plaintiff is aware of no difficulty to be encountered in the managing of this action that would preclude its maintenance as a class action.

40. Marriott also acted and refused to act on grounds generally applicable to the Class, thereby making appropriate declaratory relief and corresponding final injunctive relief with respect to the Class as a whole.

## STATEMENT OF FACTS

### A. Timeshares and Marriott

41. A timeshare is a form of joint interest in real estate in which numerous individuals share a legal interest in and enjoy the use or occupation of the real estate for a specified period of time.

42. Legal interest in a timeshare can be acquired in two ways. The first is by acquiring fee title to a specific piece of real estate for a specified period of time, which is known as a "Deeded Interval." The owner of a Deeded Interval, along with all the other Deeded Interval owners in the same real estate, collectively owns the real estate.

43. The second way a legal interest in a timeshare can be acquired is by acquiring a leasehold interest in or license to use a specific piece of real estate for a specified period of time, which is known as a "Vacation Interval." With Vacation Intervals, the real estate developer typically retains ownership of the real estate, but leases or licenses the right to use a portion of the real estate to individual lessees or licensees at agreed upon terms.

44. The specified period of time during which the owner of a Deeded Interval or Vacation Interval has the right to occupy the real estate is known as a "Timeshare Interval."

45. Timeshare Intervals generally cost between $8,000 and $20,000, depending on the interest being acquired. Additionally, Timeshare Interval owners are typically required to

pay annual maintenance fees in connection with their Timeshare Intervals, which steadily increase over time.

46. Marriott purports to facilitate the exchange of timeshare intervals among Weeks Program members through an agreement with Interval International.

47. While membership in Interval International gives Marriott Vacation Club members access to "external exchanges" with other timeshares, these other programs are of significantly lower quality than the consistently high quality of Marriott resorts that customers can expect.

48. Marriott has, in conjunction with Interval International, created a special exchange program allowing Marriott Vacation Club members to trade their timeshare weeks with one another. This system allowed members in the Weeks Program to avoid the additional expenses incurred by making "external exchanges" and by giving them priority access to Marriott resorts, which members believe are of higher quality than other timeshare programs' resorts.

49. Through a coordinated and uniform marketing strategy, Marriott created and maintained the impression that Marriott Vacation Club members in the Weeks Program would be able to use their timeshare interests for as long as they own them, and the rights of that ownership consisted of the ability to easily use the property during allotted weeks and the ability to exchange their timeshare weeks with the thousands of other Club members enrolled in the program.

50. Marriott ended the Weeks Program in June of 2010. It redirected incoming members to its newly created point-based system (the Points Program). Members in the Points Program cannot trade with other members, in either the Points Program or the Weeks Program,

for a different vacation. Instead they use allotted points as currency to reserve specific vacation locations and times using an in-house system, that enabled Marriott to avoid sharing profits with a third party exchange provider like Interval International.

51. Since ending enrollment into its Weeks Program, Marriott has limited the trading pool for members in Weeks Program because all new Marriott Vacation Club members are enrolled in the Points Program, and these new members cannot trade with members in the Weeks Program.

52. The effect of this limitation is that Marriott Vacation Club members in the Weeks Program have vastly diminished property interests that do not provide them the very benefits that Marriott promised when it sold memberships in Marriott Vacation Club to the Class. Marriott's conduct has prevented Class Members from being able to easily trade timeshare weeks for equivalent Marriott resorts in other locations. Members in the Weeks Program have been deprived of the ability to find exchanges they need.

53. Marriott has further reduced the trading pool through an aggressive marketing campaign targeting Marriott Vacation Club members already in the Weeks Program to enter the Points Program, costing these Marriott Vacation Club members large sums of money to once again have the ability to reserve comparable vacation destinations—a benefit they had already bargained for in their original agreement. Upon information and belief, Marriott initially charged $595 for Weeks Program members to enter the Points Program, but now charges approximately $2000 plus an additional annual fee of $195.

54. Not only does Marriott try to sell its Weeks Program members the rights that they have already purchased, but in addition to paying considerable amounts of money to convert their weeks, upon information and belief, Marriott skims points from its customers in the

conversion. The points that Weeks Program members receive for converting their weeks are substantially fewer than are required to vacation at the very resort at which they had their original deeded timeshares in the Weeks Program. Thus, as a result of Marriott's conduct, Weeks Program members that pay to enter the Points Program get less than what they originally had.

55. For example, if a Points Program member who wishes to vacation at a particular resort during a particular week needs 3,500 points to make that reservation, a Weeks Program member having a deeded interest in that very week at that very location will only receive 3,150 points upon converting their interest to the Points Program.

56. Upon information and belief, Marriott imposes an approximately $10,000 minimum purchase on its customers wishing to buy extra points.

57. Thus, those members of the Weeks Program that have converted into the Points Program will no longer be able to vacation at a comparable location that has been valued at an equal number of points as the owner's home resort. The only way for such a member to obtain a comparable vacation is by buying more points. Despite paying the high costs of entering the Points Program, Weeks Members would either have to pay $10,000 for more points on top of the conversion fee, or accept vacations that are not comparable to the Weeks Program member's home resort.

58. Marriott has further deprived members in the Weeks Program of value by prohibiting them from trading into its new properties. When Marriott obtains a new resort, it does not sell deeded timeshare interests and therefore provides no way for Weeks Program members to exchange their resorts to vacation at the new resort.

**B. Plaintiff's Timeshare**

59. Plaintiff, Salvatore DeSantis, entered an agreement with Marriott Vacation Club on April 11, 2006. Plaintiff paid $17,400 for a deeded timeshare interest in one of Marriott Vacation Club's resorts in Orlando, Florida called "Horizons."

60. Plaintiff decided on Horizons because of its proximity to amusement parks in Orlando, but recognized at the time that when his children got older the timeshare retained its value for him only in that he could easily trade with other Marriott Vacation Club members for different weeks in different locations. Without this benefit, Plaintiff would not have purchased his timeshare interest.

61. Using Interval International, Plaintiff was able to trade his allotted interest at Horizons for the locations and resorts he desired—as Marriott originally promised.

62. However, upon Marriott's conversion to the Points Program, Plaintiff has had great difficulty trading his interest at Horizons for the Marriott resorts he wishes to vacation at because there are far fewer available trades to make. Plaintiff has had no access at all to Marriott's newer resorts because Marriott does not permit Weeks Program members to trade into new resorts.

63. As a result of the Marriott's scheme to undercut the market for internal trades for weeks at Marriott resorts, Plaintiff was unable to obtain a reservation at a Marriott resort in Las Vegas, Nevada. Plaintiff attempted to make the exchange long enough beforehand that he would not have had an issue before Marriott stopped enrolling customers into the Weeks Program. Because he could not exchange for a Marriott Resort, Plaintiff used his timeshare in an "external exchange" for a non-Marriott resort. To engage in the external exchange, Plaintiff paid additional fees. The non-Marriott resort was of very low quality and did not approach the high

quality of the Marriott resort at which he wished to stay, or the quality of his own timeshare in Orlando. Plaintiff now only stays at Marriott locations or, if unavailable, forgoes using his timeshare and books a hotel instead.

64. At present, Plaintiff no longer seeks to use his allotted week at Horizons and wishes only to trade it for other vacation destinations—as he was promised he would be able to do in the sales presentation Marriott gave him, the documents and pamphlets given to him, and in the contract. Without the ability to easily trade for destinations equaling the quality of Horizons, Plaintiff's timeshare interest is worth far less than it would be had not Marriott stopped enrolling members in the Weeks Program, in favor of its Points Program.

65. Even though Plaintiff's timeshare interest no longer holds the value it promised to hold, Marriott continues to charge Plaintiff ever-increasing maintenance fees for the Horizons property.

66. Plaintiff would not be able to recoup his investment if he sold his timeshare interest.

67. After introducing the Points Program and crippling the exchange market under the Weeks Program, Marriott attempted to enroll Plaintiff in the Points Program and to sell him enough additional points so that he would be able to stay at resorts comparable to his own. Marriott offered him this for a total of $15,000—nearly the full amount that he paid for his original deeded interval, simply to maintain the rights he once had.

68. The Marriott sales executive indicated to Plaintiff that the Weeks Program exchange system was drying out as a result of Marriott's shift to the Points Program. The sales executive told Plaintiff that he needed to upgrade to the Points Program to stay at other resorts as easily as he had before the introduction of the Points Program.

69. Upon information and belief, Marriott is making similar offers of "upgrades" to all members of the Weeks Program.

70. Upon information and belief, Marriott has instructed its sales executives to portray the Weeks Program as a moribund system that only has value insofar they can use it to enroll in the Points Program, at a cost.

71. Marriott has thus attempted to create a demand for the Points Program among Weeks Program members by taking away the benefits members in the Weeks Program originally purchased.

72. Marriott has also used scare tactics by telling its customers that their Weeks Program membership will become worthless in order to convert them to the Points Program, to the detriment of Plaintiff and the Class.

73. As a result of Marriott's scheme to force Weeks Program members to enter the Points Program, at a tremendous cost, Plaintiff is unable to utilize all the benefits he bargained for because he cannot trade his timeshare interest for other equivalent or desirable timeshare interests. This substantially reduces the value of Plaintiff's timeshare interest.

## FIRST CLAIM FOR RELIEF

### Violations of the Florida Deceptive and Unfair Trade Practices Act

74. Plaintiff repeats the allegations above as if stated fully herein.

75. Marriott's practices complained of herein constitute the "conduct of any trade or commerce" within the meaning of the Florida Deceptive and Unfair Trade Practices Act (the "FDUPTA"), Fla. Stat. §§ 501.201 *et seq*.

76. Marriott engaged in deceptive and unfair trade practices by implementing a new and competing trade system that devalued its customers' timeshares. The trading pool in which

Plaintiff can exchange timeshares is so diminished by Marriott's conduct that Plaintiff can no longer go on the desirable vacations that Marriott induced him to purchase.

77. Marriott's creation of a competing exchange program to the detriment of its customers without offering conversion value violates FDUTPA. Marriott did this because its current customers are more easily targeted as buyers and in order to sell something to them Marriott had to create a demand. It did this by unfairly devaluing Weeks Program customers' timeshares.

78. Marriott's conduct in baiting customers into the Weeks Program and then switching the customer to its new Points Program for nearly the full amount of money that Plaintiff spent to purchase his original timeshare interest constitutes a deceptive and unfair trade practice in violation of FDUTPA.

79. Marriott unfairly pulled the rug out from under the Weeks Program that promised customers they could "[e]xperience any property within the Marriott Vacation Club system" and the benefits would extend "over the course of a few decades" to save customers "thousands upon thousands" in a hedge against "vacation inflation." Imagine the Possibilities Pamphlet pp. 2-3, Exhibit 1. But Marriott unilaterally drove down the value of its customers' investments in their timeshares to create the opportunity to charge them more for what they once had. It is a deceptive and unfair trade practice to cease offering membership in the Weeks Program to new customers, to actively disparage Weeks Program, and to solicit Weeks Program members into the new Points Program.

80. Marriott deceptively and unfairly prohibits Weeks Program members from accessing Marriott's newest resorts in contravention of its representations at the time of its sale

to Plaintiff that he would be able to trade for any Marriott resort. Marriott uses this as additional leverage to force Weeks Program members into converting into the Points Program.

81. Marriott's unscrupulous and oppressive practices caused Weeks Program members to suffer one or more of the following actual damages including, but not limited to: 1) having a severely depleted and devalued timeshare exchange pool, 2) being confined to using only their deeded real estate, 3) being forced to pay Marriott additional and substantial funds to receive a benefit they had already bargained and paid for, or 4) being forced to sell their timeshare interest back to Marriott for pennies on the dollar.

82. Additionally, Plaintiff and the Class suffered damages in an amount to be proved at trial, attorneys' fees and litigation expenses or other penalties as may be appropriate under applicable law.

83. In addition to damages, Plaintiff and the Class also seek injunctive relief pursuant to § 501.211(1). FDUTPA permits a claim for injunctive relief by "anyone aggrieved" by an unfair or deceptive act, which has occurred, is now occurring, or is likely to occur in the future. Accordingly, Plaintiff and the Class request appropriate declaratory and injunctive relief prohibiting the challenged conduct alleged herein.

## SECOND CLAIM FOR RELIEF

## BREACH OF THE EXPRESS TERMS OF THE CONTRACT

84. Plaintiff repeats the allegations above as if stated fully herein.

85. Paragraph 9 of the Plaintiff's purchase agreement with Marriott "provides for a reciprocal exchange program for owners of timeshares" with Interval International. Exh. 3, ¶ 9.

86. The Interval International exchange program to which Marriott promises access provides for "Comparable Exchange[s]" to Plaintiff, which "attempt[] to parallel, *to the greatest*

*extent possible*, the supply and demand for the week relinquished to the Exchange Program with the demand/supply for the week being requested in exchange." Exh. 4 at 7, ¶ 11 (emphasis added).

87. These provisions prohibit Marriott from engaging in conduct that causes illiquidity and inefficiency in the Weeks Program exchange market to benefit newer customers.

88. By creating a competing program that utilizes the same resort properties, Marriott artificially distorted supply and demand for its resorts within the Weeks Program. With reduced market participation (fewer people in the Weeks Program), it is difficult or impossible for members in the Weeks Program to find comparable resorts to trade for, as there are fewer comparable resorts available. Thus, Weeks Program members are forced to either settle for a less desirable resort or time of year, if the member can find *any* possible trade, or more frequently, forego using their resort as a trading currency altogether.

89. The supply and demand for resorts in the Weeks Program does not represent supply and demand for Marriott's resorts as a whole. Marriott has intentionally reduced liquidity in the Weeks Program exchange system and, by doing so, no longer provides comparable exchanges "to the greatest extent possible." It has, therefore, breached the express provisions of the contract.

90. Marriott has retained its affiliation with Interval International. The terms of participating in exchanges under the Weeks Program remain the same as when Plaintiff bought his timeshare in 2006.

91. Marriott's promise of comparable exchanges is a benefit that "will be provided so long as the Member and the Home Resort are in good standing with [Interval International]." Exh. 4 at 3, ¶ 4. Plaintiff is in good standing with his home resort and Interval International.

92. As a result of Marriott's breach, Plaintiff and the Class's timeshare interests have diminished in value and Plaintiff and members of the Class no longer have the benefits of their bargain with Marriott. Plaintiff and the Class have suffered damages in the amount of the reduction in value of their timeshares.

## THIRD CLAIM FOR RELIEF

### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

93. Plaintiff repeats the allegations above as if stated fully herein.

94. Plaintiff and Marriott contracted for the yearly use of Plaintiff's deeded property and the ability to exchange with other Marriott Vacation Club Members at resorts throughout the globe. The terms of this contract are embodied in Marriott's Contract for Purchase, HAO Condominium (the "Contract"). See Exhibit 3.

95. Paragraph 9 of the purchase agreement "provides for a reciprocal exchange program for owners of timeshares" with Interval International. Exh. 3, ¶ 9. Although prioritized internal exchanges within the Weeks Program were "subject to availability and the number of other timeshare estates in the exchange program," Exh. 2, ¶ 8, and subject to change, Exh. 3, ¶ 9, the contract does not give Marriott express authority to create an exchange program rivaling that of the Weeks Program, nor does it provide standards by which it could make such decisions.

96. Under Florida law, good faith is an element of every contract for the purchase of a timeshare. Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its

form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

97. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evading the spirit of the bargain, willfully rendering imperfect performance, abusing a power to specify terms, and interfering with or failing to cooperate with the other party's performance.

98. Plaintiff and the Class have performed all, or substantially all, of the obligations imposed on them under the Contract.

99. Marriott has breached the covenant of good faith and fair dealing in the Contract through its effort to devalue timeshare interests in the Weeks Program.

100. Marriott used its discretion to promote its self-interest, at the expense of Plaintiff and members of the Class, by creating an in-house exchange system to incapacitate the third party exchange system for the Weeks Program (with which it was forced to share profits) to try to sell Weeks Program members the benefits they already enjoyed before the Points Program was introduced.

101. Although Marriott's Public Offering Statement states that the use of the exchange program is "subject to availability and the number of other timeshare estates in the exchange program," Marriott has abused its discretionary power to affect the number of timeshare estates in the exchange program and it has done so in bad faith and at the expense of Plaintiff and the other Class members.

102. Marriott reduced and continues to reduce the pool of available exchanges that members in the Weeks Program can make. Marriott's systemic reduction of the pool of

exchanges available was beyond the expectations of Plaintiff at the formation of the contract. Plaintiff did not reasonably expect that Marriott would create a competing program that would destroy the benefit of his bargain. Marriott engaged in this bad faith performance for illegitimate motives—to enrich itself by re-selling timeshares to members in the Weeks Program.

103. Upon information and belief, Marriott salespeople are instructed to use high-pressure sales tactics to coerce Weeks Program members into joining the Points Program and to denigrate the Weeks Program. Marriott's salespeople, for instance, explain to Weeks Program members that their membership in the Weeks Program has been rendered obsolete by the Points Program and that they will no longer be able to obtain the quality of trades they did before the introduction of the Points Program. Consequently, Marriott pulls even more people out of the Weeks Program, worsening Weeks Program members' exchange capabilities and thereby decreasing the value of their timeshares.

104. Plaintiff and members of the Class have sustained damages as a result of Marriott's breach of the covenant of good faith and fair dealing.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of himself and the Class, respectfully requests that this Court enter an order of judgment against Defendant, including the following:

A. Certifying the action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and appointing Plaintiff as Class Representative and Plaintiff's counsel of record as Class Counsel;

B. An order providing declaratory and injunctive relief to enjoin the conduct about which Plaintiff complains;

C. An order declaring Marriott's practices set forth above violate the Florida Deceptive and Unfair Practices Trade Act;

D. Actual damages and other relief, as provided by FDUPTA;

E. Pre-judgment and post-judgment interest on such monetary relief;

F. The costs of bringing this suit, including reasonable attorneys' fees pursuant to Fla. Stat. § 501.2105 and any other statutory or contractual provision; and

G. Such other relief to which Plaintiff and the members of the Class may be entitled at law or in equity.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: July 1, 2014

**VARNELL & WARWICK, P.A.**

s/ Janet R. Varnell
Florida Bar No. 0071072
jvarnell@varnellandwarwick.com
Brian W. Warwick
Florida Bar No. 0605573
bwarwick@varnellandwarwick.com
Steven T. Simmons, Jr.
ssimmons@varnellandwarwick.com
Florida Bar No. 0091654
P.O. Box 1870
Lady Lake, FL 32158
Telephone: (352) 753-8600
Facsimile: (352) 504-3301

**SQUITIERI & FEARON, LLP**
Stephen J. Fearon, Jr.
Raymond N. Barto
32 East 57th Street, 12th Floor
New York, NY 10022
Telephone: (212) 421-6492
Facsimile: (212) 421-6553
stephen@sfclasslaw.com
raymond@sfclasslaw.com

**GERSOWITZ LIBO & KOREK, P.C.**
Jeff Korek
111 Broadway, 12**th** Floor
New York, NY 10006
Telephone: (212) 285-4410
Facsimile: (212) 385-4417
jkorek@lawyertime.com

**Attorneys for Plaintiff and the Proposed Class**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of July, 2014, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system and that a true and correct copy of the foregoing has been furnished via electronic mail to:

Dawn I. Giebler-Millner
gieblerd@gtlaw.com
**Greenberg Traurig, P.A.**
450 So. Orange Avenue, Suite 650
Orlando, FL 32801

Philip R. Sellinger
sellingerp@gtlaw.com
Ian S. Marx
marxi@gtlaw.com
**Greenberg Traurig, LLP**
200 Park Avenue
Florham Park, NJ 07932

s/ Janet R. Varnell
Of Counsel